### THE NEW YORK CENTRAL NO. 17.

(Circuit Court of Appeals, Second Circuit. January 15, 1919.)

#### No. 77.

COLLISION ☞105—BOAT AT FAULT—EVIDENCE.

Evidence *held* to show that collision of tug, bound up East River, with ferryboat, bound for slip in borough of Manhattan, and lying less than 200 feet off shore, waiting for slip to clear, was caused by sole fault of tug, beginning with violation of statutory duty (Ash's Greater New York Charter [4th Ed.] 1253, § 757) to keep in middle of river, and completed with violation of the ordinary rules of navigation.

Appeal from the District Court of the United States for the Southern District of New York.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Libel by the Union Ferry Company of New York & Brooklyn against the steam tug New York Central No. 17, her engines, etc.; the New York Central Railroad Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for the New York Central No. 17.

Macklin, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in admiralty to recover for a collision which occurred on February 13, 1917, between the steam ferryboat Montauk and steam tug New York Central No. 17. The Montauk left the foot of Hamilton avenue, borough of Brooklyn, at about 3:30 p. m., and was bound for the foot of Whitehall street, borough of Manhattan. The weather was clear and the tide ebb. As the Montauk neared her New York slip, she was obliged to stop for a sister boat of the same line to which she belonged, which was bound out of the slip she was bound into, as well as for a South Ferry boat going into the slip immediately above the slip of the Montauk. The Montauk complains that while she was so lying, with her machinery stopped, the steam tug No. 17 came around the Battery, bound up the East River, close in to the Manhattan shore, and that she was proceeding at a high and dangerous rate of speed; that the Montauk sounded a signal of two whistles to her, expecting that the tug would pass ahead of her, to which no reply was made, whereupon the Montauk repeated the signal of two whistles, to which no reply was given; that thereupon the Montauk reversed her engines, in order to give the tug, with her tow, an opportunity to pass safely ahead of her, and between her and the Manhattan shore; that, while the Montauk was backing, the tug, when close to her, suddenly ported her wheel and swung to starboard; that thereupon the Montauk sounded alarm whistles and put her engines in forward motion, there being no other way to avoid collision; that the tug gave no signals, but continued on with her float, colliding with the Montauk, striking her port side abaft of the wheel.

The steam tug claims that, when she saw the Montauk waiting for the boat in her slip to come out so that the Montauk could go in, she blew two whistles to the Montauk, which the latter did not immediately answer, but after some little time blew a signal of one blast; that the tug at once stopped and reversed, and blew the danger signal and backing signal, and that there was then plenty of room for the Montauk to go across the bow of the tug, if she had held her course and speed; that the Montauk failed to do this, but stopped and reversed her engines and blew the danger signal; that after blowing the danger signal the Montauk blew two blasts; that after these two blasts were blown the tug stopped and reversed and remained at rest, to see what the Montauk intended to do, and that shortly thereafter the Montauk started ahead, without blowing any whistles at all, and evidently

intending to cross the bow of the tug; that thereupon the tug again reversed, but that the boats were then too close to avoid collision.

There is no doubt that the Montauk blew two whistles, but the master of the tug did not hear them, but says that he blew two, and got no reply. The ordinary rule is to believe each party; and the fact is that each vessel by its own testimony shaped its navigation in obedience to an exchange of two whistles. We assume that in the confusion neither vessel heard the other's two whistles.

The court below has held the tug solely at fault; in this view of the matter this court concurs. The tug No. 17 was navigating in violation of what is known as the East River statute enacted by the state of New York in 1848 and which is found in the margin.[1] In the consolidation of the New York laws the original act of 1848 is put down as abolished. See Birdseye Cumming & Gilbert's Consolidated Laws of New York (2d Ed.) vol. 5, p. 5424. The rule, however, is not abrogated, but is found in the Greater New York Charter. See Ash's Greater New York Charter with Appendixes (4th Ed.), 1253, § 757. The rule as there laid down has modified the rule as prescribed in 1848 as to the rate of speed by providing that steamboats "shall not be propelled at a greater rate of speed than eight miles an hour below Corclear's Hook, nor ten miles an hour above Corclear's Hook. The testimony is that the tug was from 100 to 150 feet off from the shore, or as one witness testified "at the most not over 200 feet off." The mate of the tug testified that after the accident when marine superintendent of the New York Central "found that they (the tug) were only 100 feet off the docks" he informed them that "it was the wrong way," and that Capt. Fay of the New York Central said, "I want you to keep out further than 100 feet," and he said "we would be in the wrong if we went over 500 feet inshore." The master of the tug testified that at the time of the accident he had never heard of the statute. After the accident the men were furnished with a typewritten copy of the act.

This violation of the statute puts on No. 17 the burden of showing that the violation did not contribute to the collision. If she had been in the middle of the river, as the statute required, the collision could not have occurred. The statute is being constantly violated because vessels desire to escape from the strength of the tide and wish to save coal. But if in defiance of the act they navigate near the shore, and a collision results, as in this case, with a vessel which had a right to be where it was while waiting to enter her slip, they must abide the consequences.

It was plainly the duty of the tug to keep out of the way of the Montauk, which was lying at rest in the river, awaiting an opportunity to enter her slip. When the tug blew a two-whistle signal she knew that she could not go across the bow of the Montauk unless the latter gave

---

[1] "All the steamboats passing up and down the East River, between the Battery at the southern extremity of the city of New York, and Blackwell's Island, shall be navigated as near as possible in the center of the river except in going into or out of the usual berth or landing place of such steamboat, and shall not be propelled at a greater rate of speed than ten miles an hour." Laws of New York 1848, c. 321, p. 450, § 1.

the signal, but that her duty was to go under the Montauk's stern. The latter did not indicate that she was willing to allow the tug to go across her bow; and although the Montauk did not assent to the maneuver proposed, the tug continued straight ahead with the evident purpose of crossing the Montauk's bow. While thus coming ahead suddenly the tug ported her wheel and steered to starboard. Thereupon the captain of the Montauk, seeing that a collision was going to occur, tried to avoid it by starting ahead. He sounded an alarm and put his wheel to starboard to swing the Montauk around, but did not succeed in preventing the collision. The Montauk went ahead half a minute or less when the collision occurred. The captain on his cross-examination testified as follows:

"Q. As I understand your testimony, Captain, you say that the No. 17 blew no whistles whatever at any time? A. That is right.

"Q. And you also say that the Montauk was lying at rest out in the river? A. Yes.

"Q. And that No. 17 deliberately ported her wheel and ran into you? A. Yes.

"Q. And it was broad daylight, when everything could be seen? A. Yes.

"Q. And your account of this collision is that No. 17, notwithstanding the fact that you were in plain view, deliberately ported her wheel and ran into you, although she could have gone straight ahead and gone across your bow? A. Yes, sir."

The quartermaster of the ferryboat Richmond, belonging to the Municipal Ferry, testified as follows:

"Q. What did you observe about the course of the 17 from the time you saw her? A. When I first saw her she was off the government property; when I first saw her; then I watched her until the collision.

"Q. Did you see any change in her course? A. Yes; I saw her take a sheer out to starboard.

"Q. So far as you could observe, was there any vessel which would have prevented the No. 17 from going ahead and crossing the bows of the ferryboat? A. No, sir."

Seven witnesses, including three disinterested witnesses, testified to this sheer. No other finding than that it occurred can be made on this record. It is equally clear that it was this sheer which was the proximate cause of this collision.

No. 17 must be held solely at fault. As counsel very well said, she began with a violation of a statutory duty, in that she kept too close to the shore, and she completed her wrongdoing with a violation of the ordinary rules of navigation, thereby bringing about the collision.

Decree affirmed.