## THE BLACK DIAMOND.

## THE WILLIAM E. CLEARY.

(Circuit Court of Appeals, Second Circuit. May 18, 1921.)

### No. 238.

1. **Collision** ⊜⟿153—**Rule requiring affirmance of finding supported by evidence does not require acceptance of improbabilities.**

   The rule that the finding of the court below in a collision case, having some evidence to support it, shall be affirmed, does not require affirmance, where that would involve the acceptance of the improbable, rather than the probable.

2. **Collision** ⊜⟿95(2)—**Tug held at fault for navigating up East River near New York shore in violation of statute.**

   A tug proceeding up the East River near the New York shore, with a barge in tow on each side, *held* at fault for violating the state statute requiring navigation in the center of the river, and for being on the wrong side of the channel, which resulted in a collision when she was forced to turn to starboard to avoid a vessel backing out from her slip, and was unable to straighten out the sheer against wind and tide before her tow collided with the tow of another tug proceeding down the center of the channel; her claim that the other tug turned across her course being improbable under the facts.

3. **Collision** ⊜⟿21—**Custom of violating East River statute to avoid tide does not relieve from liability.**

   The fact that by custom some navigators took chances by following the New York side in the East River to avoid the strong ebb tide does

⊜⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not alter the rule that, when a navigator takes that chance, he violates the law, and, if a collision occurs, is presumptively at fault.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Pennsylvania Coal Company and another against the steam tug Black Diamond, of which Walker D. Hines, as Director General of Railroads, was claimant, in which the steam tug William E. Cleary, of which the Cornell Steamboat Company was claimant, was brought in under the fifty-ninth rule (29 Sup. Ct. xlvi). From a decree for the libelants against the steam tug William E. Cleary, the claimant of that tug appeals. Reversed, with directions to enter a decree against the Black Diamond.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (Leonard J. Matteson and C. W. Hagen, both of New York City, of counsel), for claimant appellee.

Park & Mattison, of New York City (Henry E. Mattison, of New York City, of counsel), for appellee Pennsylvania Coal Co. and Hines.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. On May 8, 1918, at about 2 p. m., in the East River, betwen Manhattan Bridge and Corlears Hook, a collision occurred between the libelants' boat No. 370, which was in tow of the Cleary, and a loaded car float in tow of the Black Diamond. The weather was clear, with a strong ebb tide and a strong westerly wind. The Cleary was proceeding down the river, in the center thereof, with four light boats in tow on· a hawser about 100 feet long. These boats were made up in a tier of three, with a fourth trailing behind on the starboard hawser boat. The Black Diamond was coming upstream close to the New York shore with two loaded car floats, one made fast on each side. The testimony as to the navigation and the occurrence is in conflict. The District Judge held the Black Diamond solely at fault. The probability as to this occurrence is so strongly in favor of the Cleary's claim that we are of the opinion that the result below was erroneous, and requires a consideration of the facts resulting in a conclusion which is opposed to that reached below.

[1] Probability is always a guide in determining the truth as to a question of fact. Once probability is ascertained, by holding onto it· and being led thereby, the course of justice is easily followed. We have due regard for the rule that the finding of the court below, having some evidence to support the finding of fault, will receive our affirmance. The Gangoga, 135 Fed. 747, 68 C. C. A. 385; W. G. Mason, 142 Fed. 914, 74 C. C. A. 83. Still, in the case here under consideration, a review of the evidence requires our being led by the probable rather than the improbable.

[2] Just prior to the collision, the Cleary was proceeding down the center of the river, and the Black Diamond was coming upstream admittedly close to the New York piers. The libel was filed against

the Black Diamond alone. It charged as a fault coming upstream
nearer to the New York shore, a violation of the East River stat-
ute. Laws N. Y. 1848, c. 321, p. 450, § 1; Amos C. Barstow, 66
Fed. 366, 13 C. C. A. 515; The Wm. E. Cleary, 235 Fed. 107, 148 C.
C. C. A. 601; N. Y. Central No. 17, 256 Fed. 220, 167 C. C. A. 436.
She was on the wrong side of the river. Her presence on the wrong
side of the river, close to the New York piers, presented a situation, for
her, of an emergency resulting from the transfer No. 6 backing out
from her slip on the New York side, and required the Black Diamond
to so navigate as to attempt to avoid the No. 6. This caused the tow
of the Black Diamond to swing out into the river and encroach upon
the course of the Cleary. The result was the collision.

[3] The rule made it the duty of the Black Diamond to be on the
right-hand side of the center of the stream, and not on the left. The
fact that there was a strong ebb tide, and that by custom some naviga-
tors took chances by being over on the New York side, so as to go fast-
er does not alter the fact that, when a navigator takes this chance, he
violates the law and takes the risk. If a collision occurs, his vessel is
presumptively at fault. N. Y. Central No. 17, supra. If the Black Di-
amond had navigated with due regard for this rule, in the middle of
the river, an emergency such as was presented by the No. 6 leaving her
dock would not have arisen. She was obliged to navigate so as to ac-
commodate the passage of the No. 6, and did not have sufficient power
to overcome the set of the tide and the strength of the wind, and was
unable to straighten up her car floats in time to pass the Cleary's tow
safely.

The testimony—and much of this is given by her witnesses—places
the Black Diamond coming up the stream with the outside corner of
her outside car float about 150 to 200 feet off the New York piers. The
Cleary was first observed by her off Pier 44, on a course to pass well
to starboard of the Black Diamond. She was in the center of the
river. These original courses are substantially testified to by the wit-
nesses called on both sides. The westerly wind was blowing from the
New York side and toward Brooklyn. The ebb tide sets strong over
on the Brooklyn side. The story of the Black Diamond is that the
Cleary navigated toward the New York shore, and then immediately
whipped her hawser tow against the set of the strong ebb tide and a
westerly wind, about in the vicinity of Gouverneur Slip. The Cleary
had no reason to make any stop on the way down the East River. She
was bound down the river from 119th street to Hoboken and Edge-
water, N. J. There was no occasion for her to land at the New York
shore, or to make way toward it, and no reason is ascribed in endeavor-
ing to go against the tide and wind in the maneuver claimed by the
witnesses for the Black Diamond. She was proceeding at from 3 to
3½ knots on the ebb tide. If she had held her course and come straight
up, by no possibility could the collision have occurred.

We think what she did was caused by the Transfer No. 6 coming
out of Pier 37, and as the No. 6 backed out close to the Black Dia-
mond's port bow, the Black Diamond sheared out stream with her tow
and ported her helm to clear the stern of the No. 6. There seemed to

be ample room for the Black Diamond to straighten up, after clearing the No. 6, and pass in safety to the starboard of the Cleary's tow. The Cleary had the right to expect such navigation of her. Her tow passed about 75 feet off the starboard side of the Cleary. When the car floats were a short distance from the hawser tier of the Cleary tow, the Black Diamond blew an alarm whistle, and at that time she was unable to break her shear. The Cleary answered the alarm, but it was then too late for her to pull her tow clear. The point of collision was the center of the river. At the time the Cleary tow was straight behind her—possibly a little toward the Brooklyn shore, because of the influence of the tide and wind—the starboard corner of the starboard car float hit the starboard side of the No. 370, which was the starboard hawser boat of the Cleary's tow. After the car float went clear to the tow, a helping tug came to the Black Diamond's assistance and helped to straighten her car floats upstream again.

The version given is supported by the testimony of the Cleary's crew and, in addition thereto, the master of the No. 370, and by the master of two of the boats in tow. The fact that the boats in the tow were following straight behind the Cleary at the time of collision, negatives the idea of the Cleary having swung her tow over toward the New York shore. The fact that assistance was required to straighten out the Black Diamond car floats is a strong indication of the course of her navigation. If the Cleary had turned at right angles to the New York shore, as contended, her tow, on 100-foot hawsers, would have swung downstream on the tide, and it would not have been possible for the Cleary to have whipped her tow back to New York against the tide and wind by reversing her helm. It would have resulted in the loss of control of the tow. It is also doubtful if the swing could be made around on the angle as described, resulting in collision of the car float not more than 200 feet off the piers, without the tail of the tow having first collided with the piers above the car float during the swing. The Black Diamond's claim is so incredible that we are forced to reject its story as improbable. We think the probabilities are strongly supported by the conditions, which are above described to be that in attempting to avoid the Transfer No. 6 she sheared out of the center of the river. She was at fault in taking the course of navigation she did prior to the collision. It is this that brought about the happening of the collision.

The decree is reversed, and the court below is directed to enter a decree against the Black Diamond.