## THE MORRISTOWN.

## THE FLEMINGTON.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

No. 29.

1. **Collision ⬳91—Custom cannot override established rules of navigation.**

    The existence of a custom for vessels descending the East River to pass between a drill boat and the Manhattan shore could not override the statutory rules of navigation.

2. **Collision ⬳95(1)—Violation of state statute held not to have contributed to collision.**

    A violation by both tugs of the state statute requiring vessels in the East river to navigate as near as possible in the center of the river was not a contributing cause to a collision, which resulted from a violation by one of tugs of the steering rules.

3. **Collision ⬳93—Privileged crossing vessel held at fault for change of course.**

    The privileged one of two vessels on crossing courses *held* at fault for not keeping her course, but instead turning across the course of the other vessel to enter East River.

4. **Collision ⬳106—Presence of other vessel held not to have prevented compliance with rules.**

    Where there were other vessels in the vicinity which were alleged to have hampered the movement of the privileged vessel, but they did not prevent her compliance with the steering rules, there was not a case of special circumstance.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the Central Railroad Company of New Jersey against the steam tug Morristown, of which the Delaware, Lackawanna & Western Railroad Company was claimant, in which the claimant impleaded the steam tug Flemington. From a decree dismissing the libel, libelant appeals. Reversed and remanded.

The Central Railroad Company, as owner of Lighter No. 118, filed libel against the steam tug Morristown, to recover damages for a collision on December 26, 1916, at about 4:30 A. M. in the East River, New York, between lighter No. 118 in tow of the steam tug Flemington, and car float No. 32, in tow of the steam tug Morristown.

Libel states that on the morning in question the Flemington, with No. 118 on her port side, left Grand street, East River, bound for Jersey City; the tide was strong flood. The tug and tow proceeded down the East River, and when about opposite Wall Street she observed the red light of a boat, which afterwards turned out to be the Morristown, with car float No. 32 on her starboard side, about a point on the port bow of the Flemington. In this situation the latter blew a signal of one whistle. The Morristown crossed this signal with one of two whistles and her helm was put to starboard. The Flemington saw that a collision was inevitable, and promptly reversed her engines, but the Morristown continued on in the flood tide, and brought the No. 32 in collision with the port side of lighter No. 118 causing the damages sued for.

The Delaware, Lackawanna & Western Railroad Company, as owner and claimant of the steam tug Morristown, impleaded the steam tug Flemington under the former fifty-ninth rule; whereupon libelant stipulated that it owned, controlled, and operated the steam tug Flemington. The lower court dismissed the libel, and libelant appealed.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellant.

J. E. Morrissey, of New York City, for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). We find the following facts: At about 5 a. m. on December 22d, the Morristown, with float No. 32 loaded with cars in tow on her starboard side, left the float bridges of the Delaware, Lackawanna & Western Railroad Company at Jersey City, bound for Brooklyn. The cars on float No. 32 were lower than the pilot house of the Morristown, but nevertheless the mate of the Morristown took position as lookout on top of a box car at the starboard forward end of float No. 32. The tug and her tow proceeded down the North River to go around the Battery and up the East River to Wallabout on the Brooklyn shore. The flood tide was at full strength.

There was a drill boat or dredge working on the southerly end of Coenties Reef, off Pier 5, East River; it had been there for about a year. The distance between the southerly end of the reef and the end of Pier 5 was estimated by the witnesses on the trial at about 500 feet. The chart in evidence indicates that this estimate is about correct. The drill boat was about 100 feet long and 80 feet wide, and was fastened to the reef by means of spuds, which ran from the dredge into the bottom of the river, and the drill boat's position was marked by can buoys extending about 50 feet off each corner of the boat.

In rounding the Battery the Morristown claims she was prevented from reaching the Brooklyn side of the East River by two tows coming out of the river. When the Morristown had reached a point opposite the aquarium, and between 300 and 400 feet off shore, a tug with two car floats in tow, one on each side, was observed off her starboard bow, coming out of the East River, headed toward Greenville, N. J., and in such a position that the Morristown was unable to cross her bow.

The Morristown reduced her speed and proceeded to round the Battery, passing the tug with the two car floats at a point about opposite the Governors Island ferry. At this point the master of the Morristown observed a hawser tow coming out of the East River about 500 feet off the Thirty-Ninth Street ferry slips. The tow was made up of six boats, three abreast in two tiers and was about 400 feet long. The Morristown slowed down and then stopped her engines.

After the hawser tow had cleared, the Morristown proceeded ahead under one bell, and when about 300 feet off the Staten Island ferry slips on the New York shore observed the green light of the Flemington, coming down the East River about 800 feet off shore and about 500 feet north of the drill boat working on Coenties Reef. The distance between the boats, as shown by the chart, was approximately 1,400 feet. The Flemington was towing lighter No. 118, stern first, on her port side. The master of the Flemington had seen the Morristown's red light, as above stated, and blown one whistle. This was proper, as the vessels were on crossing courses, and Morristown had the right of way and should have maintained her course and speed. The

Morristown had not at this time straightened up to do what she admittedly intended doing, viz. go between the dredge and the Manhattan shore, but she was following the curvature of the shore.

The Morristown had not heard the Flemington's one whistle and blew a two-whistle signal, which the Flemington did not answer, taking it as a cross to her signal. The Morristown immediately blew the alarm, and followed it with a second two-whistle signal, stopping and backing at full speed; while the Flemington, on hearing the other tug's two whistles, also reversed full speed. Collision was now inevitable; the Flemington's reversed engine tended to swing her bow toward Manhattan, and the course of the Morristown was also directed toward the Manhattan shore. Collision actually occurred about 200 feet off Pier 5.

[1] There was some effort at trial to establish a custom, for descending vessels to pass between the Corlear's Reef drill boat and the Manhattan shore, but the evidence was insufficient, and if established in fact could not override the statutory rules of navigation. The Hokendauqua (D. C.) 270 Fed. 270.

[2] Both tugs were disobeying the state statute of 1848 (Laws N. Y. 1848, c. 321), quoted in The New York Central No. 17, 256 Fed. 220, 167 C. C. A. 436, in that they were not navigating as near as possible in the center of the river; but that act does not dispense with the steering rules, and we find that failure to observe it was not a contributing cause of the collision, under The Clara, 55 Fed. 1021, 5 C. C. A. 390.

[3] In that case we held that disobedience to the statute did not contribute, because there was, despite such disobedience, ample room for the offending vessel to avoid the other, had she seen that other in time. So in this case, while we have found the fact to be that the Flemington first blew one whistle, which the Morristown failed to hear, the most important consideration is that the latter tug saw that she was on a course crossing that of the Flemington, and instead of obeying the rule, and maintaining the course she had, deliberately proposed a change from the rules, and proceeded to swing across the Flemington's path. The Morristown was the privileged vessel, so that, taking her own story, she first gave a signal which proposed a departure from the rules; of that she took the risk. The Newburgh (C. C. A.) 273 Fed. 436.

[4] We have stated the claims of the Morristown as to the descending tows which are alleged to have hampered her. Doubtless the tows were there or thereabouts, but there was nothing in their presence or conduct which prevented adherence to the steering rules, or produced a case of special circumstances.

Finding no contributing fault in the Flemington, the decree appealed from is reversed, with costs, and the cause remanded for entry of decree in accordance with this opinion.