## THE TERMINAL.

### ROCK PLASTER MFG. CO., Inc., v. DAVIS, Director General of Railroads.

(District Court, E. D. New York. May 19, 1923.)

1. **Collision** ⬚⟞92—**Steam lighter in harbor held at fault in turning sharply in shore on a course carrying her across bow of tug collided with.**

   Where steam lighter in East River, running in excess of the eight mile an hour speed allowed by New York City Consolidation Act, § 757, changed her course by heading in sharply towards shore, taking a course which could carry her across the bow of the tug collided with, which was close to shore, with the object of making a landing at a pier near by, *held*, that the steam lighter was at fault as respects the collision.

2. **Collision** ⬚⟞90—**"Speed" in vessel speed statute defined.**

   The word "speed," as used in New York City Consolidation Act, § 757, limiting vessel speed to eight miles per hour, means speed over the ground, and includes the tide.

   [Ed. Note.—For other definitions, see Words and Phrases, Second Series, Speed.]

3. **Collision** ⬚⟞90—**East River statute applies only for protection of vessels going in and out of slips.**

   The East River statute requiring boats navigating the East River to keep in center thereof is designed for the protection of boats going in and out of slips, and not for the protection of boats navigating in the stream.

4. **Collision** ⬚⟞91—**Where improper signal given, other vessel may cross it.**

   Where vessels should have passed starboard to starboard, a two-blast signal was the proper signal under the statute, and where an approaching boat blew an improper signal, one blast, the other boat had the right to cross it and blow a proper one.

In Admiralty. Libel by the Rock Plaster Manufacturing Company, Inc., against James C. Davis, Director General of Railroads. Decree dismissing the libel.

Macklin, Brown & Van Wyck, of New York City, for libelant.
Harrington, Bigham & Englar, of New York City, for respondent.

⬚⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CAMPBELL, District Judge. A libel was filed herein by Rock Plaster Manufacturing Company, Inc., owner of the steam lighter Terminal, against John Barton Payne, as Agent, etc., operating the steam tug New York Central No. 17, to recover damages for collision, and on the trial the libel and all papers herein were amended to substitute James C. Davis for John Barton Payne.

The testimony of the masters of both the Terminal and the New York Central No. 17 was unsatisfactory and not convincing. The Terminal, with plaster laden thereon, left the Long Island Railroad docks at Newtown creek, bound for Pier 5, Jersey City. The tide was strong ebb, weather clear, and but little wind. When off Pier 5, the Terminal was between 300 and 400 feet from the New York shore, and was making over 10 miles an hour with steam and tide. The New York Central No. 17 left the West Shore Railroad, Jersey City, with a loaded float, P. R. R. No. 32, in tow, on the tug's starboard side, came down the North River, rounded the Battery, and was between 200 and 300 feet offshore as she passed between Emigrants Station and the ferry slip.

[1] The master and engineer of the Terminal claim that, when they first saw the New York Central No. 17, they looked out on the port side and her starboard bow was towards the Terminal. This would have made the New York Central No. 17 farther out in the river than the Terminal, and required the New York Central No. 17 to pass to port. In this I believe they are in error, because I consider the testimony of the master of the ferryboat, a wholly disinterested witness, more reliable, and he fixed the Terminal, when he first saw both boats, much farther out in the river than the New York Central No. 17. I believe that the testimony given by him, which was corroborated, that both boats, the Terminal and New York Central No. 17, could have safely passed starboard to starboard, had they continued on their respective courses, truly described the situation.

This testimony gains in strength from the location of the position of both boats given by the master of the Terminal, when he first saw the New York Central No. 17, and the place of the collision, because, if his markings on the chart were correct, the New York Central No. 17, with a loaded float in tow, would have been obliged to travel against the tide, in the same time, a greater distance than the Terminal, favored by the tide. Further, the evidence shows that the New York Central No. 17 was keeping in as close to the Battery as she could to get the benefit of the slack water, going to Pier No. 4.

There was dredging being done by the government, and of the vessels engaged in that work the nearest was about 600 feet offshore from the slip of the South Brooklyn ferry. But these vessels would not have interfered with a starboard to starboard passage of the Terminal and New York Central No. 17. The evidence shows that, from the time the Terminal passed Pier No. 5, she was headed in, slightly, towards the New York shore, and, had this course been continued, she would not have been in the position where the collision occurred. I therefore find from the evidence that the Terminal, shortly before the collision, changed her course by heading in sharply towards the New

York shore, and thereby was on a course which would carry her across the bow of the New York Central No. 17.

The collision occurred about 75 feet off the long rack of the ferry to Thirty-Ninth street, Brooklyn. There was great conflict as to the signals given, but I conclude that the Terminal gave the one-whistle signal, which the New York Central No. 17 answered by the two-whistle signal, and that each boat blew an alarm. If the master of the Terminal was even approximately correct in describing the position of the Terminal when off Pier 5, and the place of the collision, both in his oral testimony and in marking the same on the chart, it is hard to understand why he set in to the New York shore, on the course he described, because he was bound into the North River and had plenty of room, going inside the dredge sweep, unless it was due to the fact that he wanted to get into the slack water rounding the Battery.

I have entirely disregarded the testimony of the witness John Tumulty, as he was completely in error with reference to the positions of the boats at various times, and especially at the time of the collision, if all of the other witnesses are telling the truth.

[2] I find that the Terminal was exceeding the speed of eight miles an hour allowed by law (section 757 of chapter 410 of the Laws of 1882 [New York City Consolidation Act]), and that the word "speed," as used in said section means speed over the ground, and includes the tide (The Plymouth [C. C. A.] 271 Fed. 461), and that said speed contributed to the collision, in that it made possible the Terminal being in the position which she was with reference to the New York Central No. 17 at the time of the collision, and prevented the Terminal from reversing and going quickly enough astern to have reduced the force, if not escaped entirely, the collision.

The libelant claims that the New York Central No. 17 violated the East River statute, which requires boats navigating in the East River to keep in the center thereof, and the testimony shows this to be a fact, because, although the New York Central No. 17 intended to make a landing at Pier 4, that did not justify her in hugging the pier ends the whole distance from the Battery to Pier No. 4, and it would appear that at no time, between the time when the New York Central No. 17 was first seen and the time of the collision, was she more than 200 feet offshore. I do not believe that it was necessary for her to go into shore as soon as she did, in order to make a landing. Nor do I believe that the position of the dredge sweep was far enough inshore to have prevented the New York Central No. 17 from having continued up for some distance nearer the center of the river.

But all of this being so, there still remains the excuse offered by the New York Central No. 17, that she intended to make a landing at Pier 4. And what can be said about the libelant's boat, the Terminal, because she had a position as far inshore as the New York Central No. 17 at the time of the collision, and with no excuse for being in that position whatever, because, concededly, she was bound for no landing in the immediate vicinity, but intended to go up the North River. Therefore she was violating the East River statute at the same time,

and her violation was more flagrant, because no excuse of any kind was offered for the same.

[3] In any event, I do not think that the East River statute applies in this case, because I take it to have been passed for the protection of boats going in and out of slips, and not for the protection of boats navigating in the stream. The William E. Cleary, 235 Fed. 107, 148 C. C. A. 601; The New York Central No. 17, 256 Fed. 220, 167 C. C. A. 436; The Amos C. Barstow, 66 Fed. 366, 13 C. C. A. 515. Furthermore, it has been held that the East River statute does not apply to a case where both boats were proceeding along the pier ends, for in such a case the violation of the statute is not a contributing cause of the collision. The Morristown (C. C. A.) 278 Fed. 714; The Lowell M. Palmer, 142 Fed. 937, 74 C. C. A. 107; The Oregon (D. C.) 280 Fed. 235; The Wrestler, 232 Fed. 448, 146 C. C. A. 442.

[4] From all of the evidence, it seems to me that the ordinary rules apply, that the vessels should have passed starboard to starboard, and that the two-blast signal blown by the New York Central No. 17 was the proper signal which the statute required. La Bretagne, 179 Fed. 286, 102 C. C. A. 651. The Terminal having blown an improper signal, the New York Central No. 17 had the right to cross it and blow the proper one. The Ashley, 221 Fed. 423, 137 C. C. A. 221.

The respondent claims that the Terminal should have maintained a lookout other than the master, who was alone in the pilot house. As a matter of law it is true that a lookout should be maintained, but in the instant case it does not seem to me that the absence of the lookout contributed to the happening of the collision, because, from the testimony of the master of the Terminal, it would appear that he saw the New York Central No. 17 from the time she rounded the Battery until the happening of the collision, and therefore the lookout would have rendered no service of any particular value to him.

I am therefore of the opinion that the Terminal should have passed the New York Central No. 17 starboard to starboard, and that, if the Terminal had maintained the course which she was on when she was off Pier 5, she would have accomplished this maneuver and probably have passed the Terminal at least 100 feet to starboard, and that her failure to do so, under the conditions and in face of the signal given by the Terminal, was a violation of the sailing rules.

Furthermore, I find that the Terminal, by making the abrupt turn into the New York shore shortly before the collision, for the making of which no reasonable excuse has been given, by her own act took herself into a position where a collision could reasonably be expected, as it was a deliberate attempt to cross the bow of the New York Central No. 17, the course of the New York Central No. 17 along the New York shore having been maintained for some time, and it must have been obvious to any one who was watching her maneuvers that she intended to remain inshore.

Decree will be entered in favor of the respondent, dismissing the libel, with costs.