## THE CUTCHOGUE.

### LONG ISLAND R. CO. v. CITY OF NEW YORK.

District Court, S. D. New York.
May 21, 1934.

622

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Paul Tison, both of New York City, of counsel), for libelant.

Paul Windels, Corp. Counsel, of New York City (P. Fearson Shortridge, of New York City, of counsel), for respondent.

BYERS, District Judge.

On June 25, 1930, at about 6:20 p. m., daylight saving time, the libelant's tug Cutchogue, running light, was proceeding up the East River, from 500 to 600 feet off the Brooklyn piers; she was struck a direct blow by the bow of respondent's ferryboat McCooey, on the port side, while the latter was crossing from South Ferry to Atlantic Avenue, Brooklyn.

The collision took place between pier 15, at the foot of Joralemon Street, and pier 18, north of the Atlantic Avenue ferry slips.

The vessels were on crossing courses, and the McCooey had the Cutchogue on her starboard hand, and was therefore the burdened vessel.

The tide was flood, and a light wind was blowing out of the west.

The Cutchogue had come around the Battery from the North River, and was bound for Long Island City, to the knowledge of the Captain of the ferryboat, who was at the wheel.

The faults alleged against the McCooey are that, being the burdened vessel, she failed to give way, or to change her course and navigate so as to pass astern of the Cutchogue, or to slow, stop and reverse seasonably; and that she proceeded at excessive speed, and failed to take proper precautions to avoid collision.

The faults attributed to the Cutchogue are the violation of the East River statute (Laws N. Y. 1882, c. 410, § 757), and that she attempted to pass between a steamer coming down river, off the Brooklyn piers, and the McCooey, and that she failed to slow or reverse, or to take proper precautions, in order to avoid collision.

The respondent's theory at the trial was that the Cutchogue was an overtaking vessel, and that she violated her duties as such, but that has been abandoned in the briefs filed for the City, and it is now conceded that there was a crossing situation, but it is urged that the privileged vessel was to blame. Such a contention is inevitable unless liability were to be conceded.

As the Cutchogue rounded the Battery, she was confronted by the following conditions: There was a dredge some 600 to 700 feet off pier 4 on the Manhattan side, which is immediately north of the South Ferry slips; after rounding the Battery, the tug passed, on its own port hand, the D. L. & W. tug Newton having a carfloat to port. This passing took place, according to the Newton, when the latter was about off pier 6 and pretty well over toward, but beyond, Governor's Island.

Ahead of the Newton, speaking generally, at a distance not precisely stated, was a Russell tug and tow made up of two or three tiers of coal boxes, not described by any witness from that flotilla.

A neutral witness said that this was a big tow, of three tiers, at least two and perhaps three abreast. It was about in the middle of the river, and, at the time in question, it lapped on its port hand a Red Star tow, consisting of the tug Portchester and two loaded cement barges on hawsers, made up tandem. That tow was about 375 feet long, and the barges were 36 feet wide.

The Red Star tow had passed the Russell tow about off the Battery, leaving the dredge which has been referred to, on the port hand.

These two tows were separated at that passing by an estimated distance of 200 feet.

When the Portchester was crossing, i. e., was off the South Ferry slip, the McCooey was coming out, on her 6:15 p. m. trip for Atlantic Avenue, and blew two whistles to the tug to indicate a desire to cross ahead, and this was acceded to and accomplished.

At this time, the Portchester was about in the middle of the river, but favoring the Brooklyn shore.

The river is about 2200 feet wide, and there was roughly then 1100 feet of water to starboard of the Portchester, less the width of the Russell tow and possibly that of the Newton and her float, in which the Cutchogue could proceed, so far as up river traffic was involved. However, the S. S. Freeman was coming down about 500 feet or so off the Brooklyn piers.

The Newton testimony is that she was about 1000 feet off the Brooklyn piers, and that the Cutchogue had passed and was "away on my right hand side."

This from a neutral witness indicates that the Cutchogue had about 500 feet of open water in which to pass to starboard of the Freeman, without getting ahead of any of the three tows.

Reverting to the McCooey, her course from her New York slip to Atlantic Avenue, Brooklyn, cannot be stated with certainty. Her Captain says he followed a straight course, heading a little to the southerly of his objective to compensate for the tide, and he indicated on the chart Ex. "A" such a course, and an almost parallel one for the Cutchogue, with an abrupt change of heading by the latter, and a right angle turn to port, at about 700 feet off pier 21, Brooklyn.

This is not accepted, for two reasons: First, he gives his first sight of the Cutchogue headed directly across the river at a point which was on the port side of the Newton off the Battery, with which no one else is in agreement; and second, because, as he made out of his slip, all three tows were in such proximity and almost dead ahead, that in order to cross their bows he would have had first to head somewhat up the river with the tide. The tows were moving at around 3 miles an hour, and the McCooey made about 9 miles at full speed, so that the Cutchogue, which made 8 miles running light at full speed, could not overtake the McCooey, much less get ahead and make the turn described.

The respondent's answer alleges that the McCooey blew two whistles to the Cutchogue, and that the latter answered with one, but the Captain of the former did not so testify.

There were two whistles blown, but, as stated by the Master of the Portchester, they were directed to and accepted by her, and she slowed down to permit the McCooey to cross ahead.

It is not a simple thing to visualize the concurrent movement of the respective vessels, because of the relative difference in speed, but the situation seems to resolve itself into a crossing one, so far as the McCooey and the Cutchogue were concerned, complicated by the presence of three intervening tows the second and third of which almost or quite lapped the one ahead, whereby they were spread out as required. The Newton is said to have been about 1000 feet from the Brooklyn shore at the time of the collision.

The Cutchogue directed her course so as to pass clear of them and also to starboard of the descending steamer. The presence of the tows forbid that she should proceed in the middle of the river, and thus adhere to the requirements of the East River statute; her Master says that her course was a rounding one, but the Newton's Captain does not so describe it. He gives her a definite heading for pier 15 in Brooklyn, and then an abrupt turn to port when about off pier 18.

This testimony is accepted substantially, but does not necessarily indicate faulty navigation if the situation is fairly comprehended; the Newton's Captain was watching the Cutchogue, and said that he could not give much of an idea about the Russell and Red Star tows because he was not paying much attention to what was happening on his port side. The Cutchogue, when passing between the Newton and Governor's Island, was necessarily heading toward the Brooklyn shore at about Montague Street, and could not circle around to port until her course up the East River was clear as to the other tows which have been described. It is found that she did this within reasonable requirement, and that, from the time that the McCooey actually headed across the river, there was presented to her a crossing situation in which she had the three tows and the Cutchogue on her starboard hand.

It is thought that the testimony concerning the two whistle signal blown by the McCooey provides the only clue to an explanation of what probably happened, namely, that this signal was intended for one or the other of the tows, and that the Cutchogue was not realized to be an important factor in the McCooey's progress to the Atlantic Avenue slip, until it was too late for the bur-

dened vessel to accommodate herself to the requirements of her position.

The reasons briefly for so concluding are these:

The Captains of the Portchester and the Newton interpreted the two whistle signal as addressed to them, and each slowed down to indicate acceptance. The Newton and the Portchester both answered this signal with two blasts, signifying acceptance, and the McCooey crossed ahead, after having angled somewhat up the river.

The Captain of the McCooey did not testify at all about blowing a two whistle signal, and seemed consciously to minimize the importance of the tows, thus: "I think there was a tow, yes. I do not remember, but I think there was a tow coming up, but I did not pay no attention. I saw it was out of the way."

The foregoing is a little too elaborate to carry conviction. The fact probably was that these three tows, which were immediately ahead as the ferryboat left the New York side, necessarily engaged the Captain's attention, and perhaps his vision was somewhat hindered as to the Cutchogue, due to the position of the sun. That was referred to in the deposition of the Master of the Freeman, who was heading toward it as it was low in the western sky.

In any event the conclusion is offered that the McCooey did not sense the necessity for holding back to enable the Cutchogue to continue her course and speed as she was required to do by the Inland Rules, until the latter blew her one whistle signal; shortly or perhaps at once, the McCooey blew the alarm, and reversed her engines, but this was too late to avoid striking the tug, as has been stated. The ferryboat had crossed safely at full speed, to midstream, and then went ahead slowly, half speed, for 10 seconds, to enable the Freeman to pass down, across the course of the McCooey as she was then headed; she then stopped her engines (but not of course her way). If she had held back completely, or reversed at that time, the Cutchogue probably could have passed up river without incident, between the McCooey and the Freeman. There was, say, 500 feet of open water when the McCooey was in midstream, between her and the Freeman, and, if the McCooey had been navigated with reference to the Cutchogue as well as the steamship, it is reasonable to suppose that the collision would have been avoided.

Preoccupation by Captain Feeley on the ferryboat, concerning first the tows and then the Freeman, is not thought to excuse the McCooey for running into the Cutchogue, because that was not an inevitable consequence of the several incidents involved.

Assuming that the facts have been fairly apprehended, it becomes necessary to discuss briefly the respondent's argument.

It is urged that the Cutchogue failed to hold her course because, instead of circling consistently parallel to the Manhattan shore, she headed on a straight course from off Governor's Island, for pier 15, Brooklyn, and then abruptly changed this with a right angle turn to port, under a hard starboard wheel; hence that the McCooey could not reckon upon a steady course by the holding on vessel. To this there are two answers: The course taken was as nearly steady as the presence of the tows permitted, and it is doubted if the McCooey relied upon the Cutchogue's course in any case, for it does not appear that the ferryboat navigated with reference to the Cutchogue at all, until the one whistle signal was given by the latter. Her heading was then up river.

The Wm. E. Gladwish (C. C. A.) 206 F. 901, does not describe this case, for there the privileged vessel made such an abrupt change of course to starboard that the burdened vessel was struck, even though she stopped and reversed her engines.

The present case cannot be decided upon the theory that the McCooey relied upon the Cutchogue's heading at any appreciable time before the Cutchogue blew one whistle.

The Southern (C. C. A.) 235 F. 78, is not unlike The Wm. E. Gladwish; i. e., in neither case did the privileged vessel hold her course. So also: The Transfer No. 4 (D. C.) 44 F. 303; Hutchinson v. The Northfield, 154 U. S. 629, 14 S. Ct. 1184, 24 L. Ed. 680; The John Fleming (D. C.) 136 F. 917; The Morristown (C. C. A.) 278 F. 714, 716; The Transfer No. 10 (C. C. A.) 184 F. 451.

The entire argument upon which these citations rest does not comport with the respondent's first contention, namely, that of a failure by the Cutchogue to hold her course; the reason is that once the crossing situation is conceded, which resulted from the Cutchogue's heading up river from 600 feet or so off pier 21, there was no change in her course or speed. Therefore a change in course, if one were made prior to the creation of the crossing situation, would not change the incidents of the latter, or relieve the burdened vessel of her duties.

It is next urged that the Cutchogue failed to comply with the requirements of the East River statute because she did not follow a course as near as possible to the center of the river. This contention is somewhat argumentative, but on the whole is probably true; that is, it is reasonable to believe that the Cutchogue could have held closer to the Newton than she did in shaping up the river, but how this would have affected her position with reference to the McCooey, when the latter was in midstream, proceeding under a slow bell to permit the Freeman to cross her path, is not capable of satisfactory demonstration. At least, it cannot be said that this was the controlling element in the situation.

The McCooey's length does not appear in the record, nor her progress at slow speed, so that her position with reference to the Cutchogue, in the event that the latter had been, say, 800 to 900 feet off the Brooklyn piers, instead of about 600 feet, when proceeding up the river, is so conjectural that no good purpose can be served by pursuing the inquiry.

The New York Central No. 17 (C. C. A.) 256 F. 220, relied upon by respondent does not help, because there the Court found that the violation of the statute directly led to the collision. It cannot be so found in this case.

The Black Diamond (C. C. A.) 273 F. 811, also relied upon, involved navigation on the wrong side of the river by the offending vessel, which was required to alter her course because of the backing out of another vessel from her slip on that side.

The Cutchogue was on the right side of the stream, and did not interfere with any vessel leaving her slip, nor otherwise bring the East River statute into play. Her position was a condition of the situation, not a cause of collision.

The Hermes (C. C. A.) 21 F.(2d) 314, and The Georgia (C. C. A.) 18 F.(2d) 743, both involved vessels on the wrong side of the river, navigating in violation of the statute, whereby damage ensued.

It was said in The Morristown, supra, that both tugs involved were violating the East River statute " * * * but that act does not dispense with the steering rules, and we find that failure to observe it was not a contributing cause of the collision, under The Clara, 55 F. 1021, 5 C. C. A. 390."

It is next urged that the Cutchogue should have stopped and backed her engines, after the McCooey blew her two whistle signal to the tug and the latter answered with one. This is based on the deposition of the Master of the Freeman who so described the exchange of signals. For reasons stated, it is thought that this version of the signals is mistaken, and that the tug did not refuse to accede to any request from the ferryboat, and that under Inland Rule 21 (33 USCA § 206) she was required to keep her course and speed, or suffer the consequences, as indicated in the cases referred to under respondent's first argument.

None of the cases cited in connection with the present contention involves facts resembling those now under examination, and it would unduly extend this opinion to refer to them solely to point out the different situations presented.

Upon the entire case, it is concluded that the McCooey did not meet the requirements of the burdened vessel, and that the Cutchogue has not been shown to have contributed to the collision by any fault upon her part.

Decree for the libelant with costs, to be settled upon notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.