## THE SYOSSET.
### No. 443.

Circuit Court of Appeals, Second Circuit.
June 18, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and W. Parker Sedgwick, both of New York City, of counsel), for libelant-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

There was a collision in the East River near the Manhattan Bridge at about 6:42 p. m., October 11, 1928, between the steamer Sagamore, belonging to the libelant Eastern Steamship Lines, Inc., and Car Float No. 15 in tow of the tug Syosset, belonging to Long Island Railroad. The Sagamore, bound for Portland, Me., was navigating up the East River, and the tug and car float, bound for Greenville, N. J., were navigating down the river on the eastern side of midstream. The libel was filed by the owner of the Sagamore against the Syosset in rem and Baltimore & Ohio Railroad Company in personam, and a cross-libel was filed by the owner of Float No. 15 against the Sagamore in rem, whose owner impleaded Baltimore & Ohio Railroad Company. The suits were consolidated after trial. The District Court dismissed the libels as against the Baltimore & Ohio Railroad Company and held the Sagamore and Syosset at fault, the former for proceeding at excessive speed and crowding, and the latter for being on the wrong side of the river. Half damages were awarded to the owner of each vessel accordingly. The Long Island Railroad Company, as owner of the Syosset, appeals from so much of the decree as holds the Syosset at fault. It seeks a dismissal of the libel against the Syosset and a decree in favor of the Long Island Railroad Company for full damages to Car Float No. 15 as a result of the collision, instead of the half damages awarded.

No appeal is taken and no assignments of error are filed by the owner of the Sagamore, and no error is assigned by any of the parties to the dismissal of the libel and petition against the Baltimore & Ohio Railroad Company.

In our opinion, the Sagamore was wholly responsible for the collision. When she had come up the East River to a point below the Brooklyn Bridge, she saw the Syosset, with Car Float No. 15 on her starboard side, above the Manhattan Bridge and about 300 feet off the Brooklyn shore. The Sagamore and the Syosset were then in a starboard to starboard position. Ahead of the Sagamore, and also up stream, was a lighter to which the Sagamore blew one whistle in order to pass her on the right. The lighter sounded no answering signal but, when the Sagamore had come up within 75 feet of her, crossed to starboard in front of the Sagamore and went into a dock on the Brooklyn side of the river. Because of this unexpected movement of the lighter, the Sagamore was obliged to back, and, in so doing, swung her bow about two points to starboard in the direction of the Brooklyn shore and thus got out of her course, which lay only a little east of the center of the stream. To break this sheer she started up her engines as soon as the lighter had crossed her bow and was carried forward and into Car Float No. 15, in tow of the Syosset, which was then close to the Brooklyn piers. As we have stated, the Syosset was on the starboard of the Sagamore when the vessels first came into one another's view, and she so remained, after the Sagamore had changed her position to avoid the lighter and had been carried further toward the Brooklyn side of the river.

The Syosset as she came down the river swung somewhat nearer to the Brooklyn shore. After the Sagamore sheered to starboard, the Syosset attempted to avert a collision by backing, but the Sagamore apparently had lost control and came into collision with the starboard corner of Car Float No. 15. The collision occurred only about 50 feet from the Brooklyn shore and just above the Manhattan Bridge at a time when the Syosset and her float had not only lost all headway, but had backed for some distance.

The Sagamore seeks to excuse herself on the ground that the Syosset was on the wrong side of the stream in violation of the East River statute. She contends that she could not have backed further to avoid the Syosset, because of the risk of getting broadside of the flood tide and being carried up stream against

668

a dredge that lay off Corlears Hook, or of colliding with the tug Marion and her tow which were coming down the river on a course that lay to the west of the dredge. But the dredge was three-quarters of a mile away from the Sagamore and the Marion and her tow were not far from the New York shore. Between the latter and her tow and the course on which the Syosset was navigating was an interval of water about 800 feet in width. Under such conditions it seems evident that the Sagamore had ample room on her port side and, by backing further in that direction, could have avoided the Syosset's car float. At any rate, she was plainly at fault for crowding on the lighter and getting so far out of position as to find difficulty in straightening herself in order to keep out of the way of the Syosset and her float. She was an overtaking vessel. When she signaled and received no permission to pass the lighter, she was bound to allow for and take the risk of any movement of the latter. The Industry (C. C. A.) 29 F.(2d) 29. If she had not put her engines ahead after the lighter crossed her bow, but had either kept the slight headway she then had or had backed further, doubtless she would have passed the float starboard to starboard. Instead of this, she took the great risk of speeding up her engines, changing her own original course, and getting the Syosset to co-operate in a maneuver which would necessitate a change in the course of the latter, though the two vessels were then only one-third of a mile apart. We think that the Sagamore was grossly at fault and that the Syosset did the best she could in blowing an alarm, backing, and getting as near to the Brooklyn shore as possible.

█ It is true that the Syosset was at all times considerably to the east of the center of the stream, and therefore violated the East River statute, but that did not make her an outlaw. The Sagamore was fully aware of her position in time to navigate with reference to her and her float so as to pass them safely. She saw the fault of the Syosset in ample time to shape her own conduct accordingly. When the Syosset was in plain view, the Sagamore ought to have held back so as not to crowd the lighter in front of her. She had no excuse for getting out of her course and becoming, as she claims, unable to avoid the Syosset and her float. On the contrary, it was her duty to keep in position in order to pass them starboard to starboard, and her neglect to do this caused the collision. Even after she became out of position she could have backed away from the float or, at any rate, remained where she was. She certainly was not justi-fied in starting forward her engines and crossing directly over to the Brooklyn shore and into the float. She could have kept out of danger by not crowding the lighter and by navigating prudently even after it had passed in front of her. On the record before us we hold that the violation by the Syosset of the East River statute was a "condition" and not a contributing cause of the collision. The Montauk (C. C. A.) 9 F.(2d) 882; The Penoles (C. C. A.) 3 F.(2d) 761; The Morristown (C. C. A.) 278 F. 714; The Wrestler (C. C. A.) 232 F. 448; The Clara (C. C. A.) 55 F. 1021; Long Island R. Co. v. Killien (C. C. A.) 67 F. 365; The Britannia (D. C.) 34 F. 546, page 557.

It is argued that under The Georgia (C. C. A.) 18 F.(2d) 743, The Black Diamond (C. C. A.) 273 F. 811, and The Ashley (C. C. A.) 221 F. 423, we ought to hold the Syosset at fault for failing to navigate as near as possible to the center of the East River.

Perhaps the opinion in The Ashley indicates that the mere violation of the East River statute by the tug Ashley was a sufficient ground for holding her liable; but it seems more probable that the Ashley was impeding the Volunteer at a time when the latter was proceeding to her berth at Wallabout, whither she was bound. If such were the case, the violation of the East River statute would have been a basis of liability.

In The Georgia (C. C. A.) 18 F.(2d) 743, the tug Athens was criticised for coming down the East River along the Brooklyn shore, but the collision was said to have been due to her stopping when she should have kept her course and speed. The court held that the Georgia had done all that prudent navigation required in order to avoid a collision. The remarks about the violation of the East River statute by the Athens were therefore unnecessary to justify the decision.

The Black Diamond (C. C. A.) 273 F. 811, is not in point. That tug violated the statute by going up the East River along the New York shore. When thus navigating she was forced to turn to starboard in order to avoid a vessel backing out of her slip and thereby sheered into a passing tow. Her disregard of the statute which was passed to prevent interference with vessels entering and leaving their berths in the East River was the immediate cause of the collision. In other words, her unlawful position in the river required her to swing out of her course to avoid a vessel leaving her slip and thus directly contributed to the accident. In the case at bar, the violation of the statute by the Syosset in no way

prevented the Sagamore from navigating with entire safety. The Sagamore got out of position solely because she disregarded the rule applicable to an overtaking vessel and her divagation in disregard of that rule resulted in the collision.

The decree should be modified so as to exonerate the Syosset and hold the Sagamore solely at fault and liable to the Long Island Railroad for damages to its car float and property.