## THE W. N. BAVIER.

### THE H. M. WHITNEY.

(Circuit Court of Appeals, Second Circuit. April 13, 1907).

#### No. 157.

COLLISION—TOW AND MEETING STEAMER—IMPROPER NAVIGATION BY TUG.

A collision in East river between a canal boat, which was one of four in tow of a tug passing down on an ebb tide, and a steamer passing up on the Brooklyn side of the center of the channel, *held* due to the fault of the tug, which, after exchanging the proper passing signal of one whistle with the steamer and properly porting her helm for a time, starboarded it again when about the center of the channel, allowing her tow to sag to port with the tide and against the steamer. The steamer *held* not in fault because of her violation of the East river statute, which required her to keep in the middle of the channel, since it in no way contributed to the collision, nor because she did not go still further to starboard than she did; her change of course being sufficient for safe passage if the tug had continued to co-operate, as she had the right to assume would be done after the exchange of signals.

[Ed. Note.—Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeals from a decree of the District Court, Southern District of New York, which held both vessels in fault for a collision between the Whitney and libelant's canal boat Emergency, in tow of the Bavier, which happened in the East river opposite Wallabout Bay, and to the south of Corlear's Hook, August 16, 1904, at about 6 p. m.

Amos Van Etten, for the Bavier.
H. Putnam and Wing, Putnam & Burlingham, for the Whitney.
J. K. Symmers and Carpenter, Park & Symmers, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The Bavier had four boats in tow, made up in two tiers astern on a hawser of about 100 feet; the Emer-

gency being the port boat on the second tier. The entire distance from the tug's bow to the last boat was about 380 feet. As we have already held in The A. W. Booth, 138 Fed. 303, 70 C. C. A. 593, no fault can be charged against the Bavier because of the length of her tow; but she was bound to navigate with a degree of care commensurate with the risk thereby incurred. All the boats in the tow were light. They had no steering apparatus of their own, but were dependent on the direction of the hawser for their steering. The tug left Rivington street, bound for Fifty-First street, North river, with this tow heading up river, and rounded to until she headed down river; the tide being ebb. The steamship was bound up the river for Boston. The collision happened to the eastward of midchannel —about two-thirds of the way over towards Brooklyn, the district judge finds, and the clear weight of evidence supports that finding.

Accordingly to the story of the master of the Bavier, he was a little to the eastward of mid river when he saw the Whitney. He had brought his tug nearly into position, but his tow, under the influence of the ebb tide, which has a set towards Brooklyn, was tailing over more to the eastward. The Bavier was under a port helm. She was about off Jackson street, when he saw the Whitney coming up about off Gold street, and nearer to the Brooklyn shore than his tug was. The Whitney blew one blast, and he answered it with one. The navigation thus announced by both boats was proper. They were meeting in the first position (article 18, rule 1 [U. S. Comp. St. 1901, p. 2881]), and their courses were not on the starboard of each other. It was their duty to pass port to port. As soon as whistles were exchanged the master of the Bavier put his wheel harder to port, in order to pull his tow over out of the way. The distance between the two vessels was ample when whistles were exchanged, and, had he kept his port wheel, the Whitney cooperating, there was no reason why the steamship and tow should not have passed each other with a reasonable margin of safety. The disaster is sufficiently accounted for by his admission that after he had been heading well over to the New York shore, until "he thought his tow would go clear," he starboarded and headed straight down the river, although he admits that his tow was "a little to the eastward of the middle of the river." This was apparently at the very place where the course of the river changes nearly from S. W. to W. The natural result was that the tow, relieved of pull to the westward, swung down with the tide upon the Whitney.

The master of the Bavier evidently appreciated that his change of helm brought the vessels into collision; for he undertook to explain it by the presence of another vessel, which he alleges interfered with him. This was a New York, New Haven & Hartford car float, which was coming up about abreast of the Whitney. He says he pulled under the port wheel as near the float as he could, as near as he thought safe; that he did not want to pull across the float's bow, and therefore starboarded. A majority of the court are not disposed to credit this excuse. He admits that his tow was to the Brooklyn side of mid river, and the most he claims for his own position is mid river. We are of the opinion that he had not reached mid river;

but, for the purpose of the argument, it may be assumed that his statement is correct. He says that, when he first saw this craft, a tugboat (the Dunne) was coming up with a lumber barge on each side of her, about 75 to 100 feet off the New York shore, and that the car float, with her tug, was about 30 to 50 feet outside the Dunne; that there was easily 1,000 feet between the car float and the Whitney, and that the car float and tow did not come out over towards the Whitney, but "kept in to the New York side, where they belonged." If he himself were in mid river, he was at a considerable distance from the car float. Moreover, according to his story, he kept on a considerable time heading for the tug and car float in full sight of them, until he got within 50 feet, but received no signal from them, and blew them none. Appreciating the weakness of this excuse he also said that he starboarded in order to slew his tow, an excuse quite as unsatisfactory. We are of the opinion that he was in fault for not continuing under his port wheel until he had brought his tow to mid river.

A majority of the court are also of the opinion that the Whitney was not in fault. She was coming up the river well over towards the Brooklyn side, presumably on account of the ebb tide. But, if she were in fault for not navigating nearer the center of the river, under the East river statute (section 757, c. 410, p. 211, of the New York City consolidation act of 1882), such fault in no way contributed to the accident. The boats met in the first position, end on, or nearly so, and not on each other's starboard bow, and exchanged signals when at a sufficient distance to insure passing in safety, if both navigated in conformity thereto. As we have seen, the Bavier did not so navigate. After porting, she starboarded, and thus let her tow sag down, where it would not have been had she continued under a port wheel. The Whitney ported; and (except just before collision, when she starboarded to regain control lost by backing) kept changing her course to starboard. It is probably true that she might have gone still further to starboard without running into the Navy Yard piers, and might have passed to the eastward of the tow, even if the Bavier had not ported at all. But the vessels had exchanged signals, which indicated that the Bavier would haul to starboard, and the latter was seen to be hauling over towards New York. The master of the Whitney was entitled to suppose that she would continue to navigate accordingly, and, having himself ported sufficiently to make reasonably safe clearance, should not be held in fault because the other vessel, without giving any warning, suddenly ceased to cooperate. Vessels navigating according to the rules may fairly suppose that other vessels they meet will so navigate, unless something occurs (such as a failure to answer a signal received, or a failure to conform to a signal blown) to indicate that the contrary may be anticipated. Kennedy v. The Sarmatian (C. C.) 2 Fed. 911.

The decree of the District Court is reversed, with costs of this appeal to the Whitney against the Bavier, and cause remanded, with instructions to decree in favor of libelant against the Bavier for damages, interest, and costs.