THE MAINE. THE GAMECOCK. Petition of FAIRFIELD S. S. CORPORATION.

(District Court, D. Oregon. November 10, 1924.)

No. A-9371.

1. Collision ⊕═95(4)—Steamship held in fault for collision with log raft.

A collision, between a steamship passing down Columbia river at night and the second of two long log rafts in tow passing up on the Oregon side, held due solely to the fault of the steamship, which had knowledge from the lights on the raft that it had been swung out by the strong wind, until it partly obstructed the channel, in time to have stopped and to have avoided the collision.

2. Collision ⊕═60—Duty of steamer to exercise extra precaution to avoid collision with unwieldy tow.

While a tug with a heavy and cumbersome tow is held to a high degree of care, it is also the duty of a steamer meeting such tow to keep out of its way and to exercise extra precaution to avoid collision.

In Admiralty. Libel by the St. Helens Lumber Company against the American steamship Maine, with the Fairfield Steamship Corporation as claimant and petitioner. The river steamboat Gamecock and the Willamette & Columbia River Towing Company were impleaded as respondents to the petition. Decree for libelant against the Maine.

M. B. Meacham, of Portland, Or., for libelant and respondent Willamette & Columbia River Towing Co.

Wood, Montague & Matthiessen, of Portland, Or., for claimant and petitioner.

WOLVERTON, District Judge. [1] On the evening of the 5th of December, 1923, the steamer Gamecock was proceeding up the Columbia river, having in tow two log rafts, each of the length of 720 feet, attached by a towline of 900 feet, making the line and the tow 2,340 feet in length. The steamer, with her tow, started from Beaver Slough at about 1:20 p. m., keeping to the Washington side of the river. By 6 o'clock it was raining and blowing slightly. When the steamer approached Fisher's Island, she swung across stream to Walker Island light, in order to take advantage of slack water on the Oregon side; thence she continued along the margin of the island, and, having passed it, curved rather to the southward

and then back somewhat, for passing at a point off Walker Island Dike light. The wind was then blowing from the southwest, or near that course, striking the Gamecock on her starboard quarter. The velocity is estimated at from 45 to 60 miles an hour. The Gamecock's running lights were in place, and she was carrying twelve white lights on the rafts, namely, a double light at each end and in the middle of each raft, standing from three to six feet above the water. The lanterns consisted of globes eight inches in height by four in width. Though the wind was blowing strongly, the tug had no difficulty in towing the rafts. It was unable to keep the tow in its lead, however; the tow being carried by the wind out into the ship's channel.

When, according to the Gamecock's master, the boat was 100 to 200 feet below the Walker Island Dike light, at about 9:45 or 10 p. m., the steamship Maine, proceeding downstream, collided with the tail raft, about 250 feet from its after end, and cut it in two, thus breaking it up, and a number of logs were lost. The master of the Gamecock estimates that the tail of the tow, while at the time out into the channel, was not across it, and that it extended to within 400 or 500 feet of the Washington shore; not less than 400 feet. He fixes the estimate from the fact, as he states, that in looking back along the line of the tow, the range carried his vision down between the Barlow Point lights and the Walker Island light, thus throwing the range offshore from the Barlow Point lights. These latter lights are on the Washington shore.

Bodine, the mate on the Gamecock, differs from the master somewhat, in that he estimates that the tail of the tow was about 250 to 300 feet from the Washington shore. According to his view, the raft was in the channel, but not across it. He further states, in effect, that the tail light would range below the Barlow Point lights—would strike off- shore from them.

The danger of collision was not discovered on the Gamecock until the raft was struck by the Maine. Passing port to port signals were sounded. It is in dispute as to which boat sounded first. No danger signals were blown, except by the Maine either just before or at the time she collided with the raft.

The Twin Cities at the time was also proceeding up the river with a tow of two rafts of logs, of about the same length as that of the Gamecock. She was in the lead of the

Gamecock by one-half to three-quarters of a mile, and at the time of the collision was near the upper end of the Walker Island Dike; the tail of her raft reaching to a point above the dredge and about 300 feet above the light. The raft, as related by her master, swung a little out into the river.

The steamship Maine differs very materially from the Gamecock in fixing the locality of the latter at the time the passing signals were sounded and the collision occurred. She fixes the Gamecock's locality 2,250 feet, or thereabouts, above where the Gamecock does, and by the extension of the tow, with direction and all, locates the extreme end of the tow quite considerably across the ship's channel.

The pilot in charge of the Maine relates, in effect, that he did not blow a passing whistle for the Twin Cities for the reason that she was in behind the dike. The Gamecock was at the tail end of the Twin Cities' raft. He first saw the Gamecock when abreast of the La Du fixed red light, while running down on the Slaughter range. When abreast of the La Du beacon light, he blew a passing port to port signal to the Gamecock, and changed his course to the La Du range, keeping to the northward of the range. He saw that the raft was "pulled over," "could see lights back there," but "couldn't tell exactly what position her tow was in." As he proceeded further, he "could see his lights close to Barlow Point. In fact," he continues, "they shut the Barlow Point light off from where we were. Then I slowed down. * * * I saw it was going to be pretty close there; that we couldn't get by. * * * I stopped the engine, and put her full astern. As near as I can remember, we backed for about a minute, probably a minute and a half. The wind was strongly from southerly-southwest, set her over to the Washington side. She began to feel the bottom there. She wouldn't steer any more—began to feel the bottom." At this juncture the pilot starboarded his helm, which put his ship out towards the center of the river again, and she cut across the raft. Just before striking the raft, he blew a danger whistle, and as she got afoul of the raft, he stopped her.

Capt. Hatch, the master of the Maine, confirms the pilot, practically, in most of the material particulars.

In approaching a decision of this controversy, we are first confronted by the very material difference between the parties as to the true location of the Gamecock and her tow at the time of the collision. I am constrained to the view that she was located practically at the place fixed by the libelant, or in that vicinity. This was slightly below the Walker Island Dike light. A dredge intervened between her and the dike, but she was as near the dike as was convenient for navigation. The officers of the Gamecock so fix her location, and I have no reason to disbelieve them. They were in better position to know her exact situation than the pilot or officers on the Maine, and are in that particular entitled to the greater credit.

So locating the Gamecock, she was first sighted by the pilot when the Maine was practically a mile distant upstream. The pilot also discovered that the Gamecock was drawing a tow when the Maine was abreast of or a short distance below the La Du beacon light, which was yet near 5,000 feet distant. He saw then that the Gamecock's tow was "pulled over," as he terms it; that is, that it extended out into the stream or ship's channel. The dredge-cut channel at this point is 300 feet in width, and the river from the dike to the Washington shore is 1,750 feet in width. The pilot could see the lights on the rafts, although he says, from the confusion of lights, he could not tell the length of the tow; nor that it extended across the channel until he was abreast of the peak of the upper raft, which would be about 1,400 feet from the tail end. Previously, however, perhaps before the inspector, he said that he first became acquainted with the fact as soon as he rounded the La Du beacon. When intercepting the La Du range, he kept to the north of it, and as he neared the Gamecock's tow, he passed out of the dredged 300-foot channel toward the Washington shore. Keeping on down, and seeing that "it was going to be pretty close," he stopped his engine, and put the ship full speed astern, and backed for a minute or a minute and a half, and, when she began to feel the bottom, he put his helm hard astarboard for taking the center of the river again. The course thus shifted brought her directly in collision with the second raft, which broke the raft in two. The pilot claims that, just before striking the raft, he blew the danger whistle. The officers on the Gamecock claim that the signal was not given until the collision occurred.

In corroboration of his position when the collision occurred, the pilot insists that, as he approached, he saw that the lights on the raft shut off the Barlow Point light,

and he even passed so far inland as to bring the two Barlow Point lights in range. If this were true, the ship was undoubtedly in great danger of beaching on the Washington side. But if the position of the Gamecock was as fixed by her officers, this was impossible, for the tail end of the raft would have had to reach very near to the Washington shore, which could not have been the case. If it reached to within 250 feet of the Washington shore, as Bodine testifies, there was yet ample room for the Maine to pass between the raft and the shore with perfect safety. Bodine, while believing that the tail of the tow was about 300 to 250 feet from the Washington shore, not less than 250, says, nevertheless, that the raft was not across the channel. If the raft was not across the channel, the Gamecock's master was nearer right in his estimate that the tail of the tow extended to within 400 or 500 feet of the Washington shore, not less than 400 feet. In corroboration of the Gamecock's officers, we have their statement that they could see both the Barlow Point light and the Walker Island light, and that the line of the tow, looking backward, brought the tail between these lights; that is, offshore from the Barlow Point light.

The tide was at the last of the ebb, and the ebb plus the current gave a flow of about three-quarters of a mile to the hour. With the wind blowing at the velocity it was at the time, it was estimated that it would hold a sawlog about stationary in the stream. This is the opinion of the pilot. Taking it as a reasonable estimate, in connection with the statement of the Gamecock's officers that the tail of the tow ranged offshore from the Barlow Point lights, it is hardly probable that the tail of the raft passed beyond the channel.

Among the specifications of negligence, it is asserted by the libelant that the Maine did not stop and reverse her engine in time to avoid striking the raft, and was improperly and carelessly navigated. These specifications, in my view, have been sustained by the evidence. The navigation officers were seasonably apprised of the position of the Gamecock, and at once either signified or consented with her to a port to port passing. Only shortly subsequently the Maine became apprised that the Gamecock was incumbered with a tow, and saw the lights on the tow. The night was dark, and a heavy wind was blowing—almost, if not, a veritable gale. It was customary for boats to carry a tow of like construction

and dimensions as the one attached to the Gamecock, and on the same course adopted, and the pilot of the Maine was not unaware of these conditions, and should have been forewarned of the probable situation at the time he became aware that the Gamecock had a tow of logs in charge. This was in ample time so to have managed her navigation as to readily avoid the threatened danger. She should have been brought to a full stop at once, or very soon after she was put at half-speed ahead. Such a maneuver would have afforded time to clear up the situation, and the collision could have been avoided.

On the other hand, it is asserted that the Gamecock was negligent, in that she had too long and heavy a tow, that she allowed it to block the channel, that she agreed to a port to port passage when she knew the channel was obstructed by her tow and dangerous, and that, under the circumstances, she failed to blow the Maine a danger signal.

If it be conceded that the Gamecock was negligent in not seeing to it that her tow followed in her wake, and in allowing it to be driven by the wind far into the ship's channel, it is manifest that such fault was not the proximate cause of the collision. The Maine could and should have avoided it, and in not doing so is responsible for the accident.

[2] While it is true that a tug with a heavy and cumbersome tow is held to a degree of care commensurate with the risk, or, as some authorities seem to hold, to a high degree of care, or extreme care to avoid danger of collision (The H. M. Whitney, 86 F. 697, 30 C. C. A. 343; The Gertrude, 118 F. 130, 55 C. C. A. 80; The Plymouth, 186 F. 105, 108 C. C. A. 217), it is also a rule of general application that, as between a steamer and a tug, although drawing a cumbersome tow, it is the duty of the steamer to keep out of the way of the latter, and to exercise extra precaution to avoid collision. The Syracuse, 9 Wall. 672, 19 L. Ed. 783; The Westhall (D. C.) 153 F. 1010, 1013.

The fault conducing as the proximate cause being with the Maine, the libelant is entitled to the damages sustained by it by reason of the collision.

Libelant lost 34 logs and a boom-stick and chain, of the value of $1,126.61, and the reasonable expense of gathering the logs set adrift, with the use of the boat and all, was $670, making a total damage sus-

tained on account of the collision of $1,796.61.

The libelant will have a decree for this sum against the Maine, and for its costs and disbursements.