## THE BOFISCO.
## THE QUOGUE.

## THE HEMPSTEAD.
## O'BOYLE v. LONG ISLAND R. R.

District Court, E. D. New York.
March 25, 1930.

Single & Single, of New York City (T. H. Middleton, of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (A. Howard Neely, of New York City, of counsel), for steam tug Quogue.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for steam tug Hempstead.

INCH, District Judge.

On August 5, 1925, about 4 o'clock in the afternoon, daylight saving time, libelant's barge Bofisco came into collision with the tug Quogue, owned by the Long Island Railroad. Damage was done to the barge. Libelant has sued the tug Quogue. The claimant of that tug has duly impleaded the tug Hempstead, which had the Bofisco in tow at the time.

The decision of the issue as to who was to blame for the collision depends upon findings of fact, which in turn must be based on the testimony of various witnesses, whose demeanor on the stand, and the probabilities of their stories, have been carefully considered by the court.

The facts substantially undisputed are as follows:

The testimony of Strout, master of the barge Bofisco was taken by deposition.

On the day and prior to the time in question, the tug Hempstead was proceeding down the East River with four loaded sand barges in tow, on hawsers of "15 fathoms" in length. These sand barges were each about "110 feet long," and were in two tiers, the second tier about "2 feet" from the first tier. They had a free board of 2 or 3 feet. They drew about 10 feet.

The Bofisco was the starboard barge in the last tier. This barge was loaded with about 600 tons of sand.

The tide was about the last of the ebb. The weather was a little cloudy, but visibility was good. There was an easterly wind blowing, variously estimated as between 9 and 14 miles.

The Hempstead and her tow had proceeded down the East River with the intention of rounding the Battery and going up the North River. The ultimate destination of the tow was Buffalo.

When the Hempstead and her tow was coming "down a little above the Brooklyn Bridge the steam tug Quogue was coming up the East River about opposite Pier 17, Manhattan side."

The Quogue is about "90 feet long, over 20 feet wide," and she had on her port side a car float on which were 19 freight cars.

The Quogue and her float at first had been coming up on the Brooklyn side, but, observing ahead a dredge, anchored with four cables from each corner, and another tug and tow proceeding ahead between the Brooklyn side and this dredge, which, according to Captain Hinchey of the Quogue, "blocked this side," and possibly for other reasons, the Quogue had come diagonally across to the New York side and then proceeded up, parallel with the Manhattan piers. Between her car float and these piers was a Standard Oil tow. The forward part of the Quogue's car float was "partly lapping this tow."

The Hempstead and her tow was coming down near the middle of the stream and following a gradual bend of it below the Brooklyn Bridge. The Quogue and her car float were proceeding up practically parallel with the pier ends. There was no room, however, for her to turn to her port.

The libel alleges a different situation, but, as no comment is made and the facts clearly appear otherwise, I shall decide according to the proof.

As the Hempstead and the Quogue approached each other, the situation disclosed by the proof indicates substantially the same condition as that stated in The Wrestler (C. C. A.) 232 F. 448, where Circuit Judge Ward, states, at page 450: "All the witnesses agree that as they were meeting they were obliged to pass starboard to starboard. They were navigating where they were for obvious reasons, which each perfectly understood. * * * There was no misunderstanding between them as to the way they should pass as is proved by the fact that no signals were exchanged, and that no alarm was blown by either indicates that the emergency which arose was sudden."

After the Quogue and the Hempstead had safely passed each other with a space of between 75 to 100 feet between them, the barge Bofisco, at the tail of the Hempstead tow, and the Quogue, collided. This contact was about 25 feet from the stern of the barge.

The witnesses disagree as to what caused this collision. Captain Hinchey of the Quogue claims that there was plenty of room for the Hempstead and her tow to pass safely, and that, while he did expect a slight turn on the part of the Hempstead and her tow, "I thought he would handle his tow so that it wouldn't swing so much. I expected it to swing a little. He must have swung all of 100 feet."

The car float on the port side of the Quogue was forward of the bow of the tug

about 200 feet. There was no collision between this float and the tail of the Hempstead tug.

The contention of the Hempstead is, according to Gaines, her captain, that he was proceeding straight down the river and passed the Quogue 75 to 100 feet; "that just as he passed, the Quogue took a sheer for the tail end of his tow;" that "he saw this sheer;" "that his tow was following straight;" "that the Quogue hit the stern of the barge."

The situation therefore is that the witnesses for libelant and for the Hempstead claim that the Quogue ran into the tail of the Hempstead tow, while witnesses for the Quogue claim that the tail of the Hempstead tow swung out of line into the Quogue.

Questions of fact of this kind are sometimes difficult to solve, but, where there are facts that can be fairly found, and inferences from such facts reasonably and fairly present themselves, the court may, by carefully considering all the surrounding circumstances, arrive at a true conclusion as to what happened. Norwich Co. v. Wright, 13 Wall. (80 U. S.) 104–115, 20 L. Ed. 585.

█ At the outset, however, there are certain alleged faults which did not enter into this case as contributory to the collision. One of these is as to the alleged absence of a lookout for the Quogue.

I have some doubt as to whether Herrick, deck hand of the Quogue, was keeping a very good watch. He stated he did not see the Hempstead and her tow until she was about 800 feet away, although there was nothing to prevent him seeing her before that. Not only this, but his testimony appears at times inconsistent and far from satisfactory.

The presence or absence, however, of a lookout in this case, although Herrick might have been incompetent, had nothing to do with the collision. The Maria Martin, 12 Wall. (79 U. S.) 31–44, 20 L. Ed. 251. The two vessels, for a considerable period of time, were each well aware of the other's presence and what each was intending to do. The technical absence or failure of a lookout was not a contributory cause.

█ Nor do I think that the effect of the ebb tide, which was about slack, is material here. The collision took place at a point opposite the Manhattan shore. The preponderance of proof shows that there was no effect on these four heavily loaded sand boats. The same applies to the effect of the wind or breeze, estimated from 9 to 14 miles. The preponderance of proof shows that this had no effect on these heavy barges, which had only about 2 feet free board.

█ Finally, the East River statute did not apply. The Wrestler (C. C. A.) 232 F. 448, The W. N. Bavier (C. C. A.) 153 F. 970, The Terminal (D. C.) 290 F. 533.

We therefore have a collision in broad daylight, and either the Quogue ran into the tail of the Hempstead tug or the captain of the Hempstead carelessly allowed the tail of his tow to get out of line between 50 and 100 feet. There could be no excuse for either.

█ I am convinced that the captain of the Quogue was careless. He knew exactly the situation. He proceeded "hooked up" into that which he terms a "pocket" at a time, as he himself testified he expected that the tail of the Hempstead tow might swing toward him slightly as it properly followed the course of the Hempstead. He nevertheless proceeded at a rate of at least 5 or 6 miles and possibly more. He had no right to proceed in this manner on the assumption that the space between the tail of the Hempstead tow and the boat would be greater than it actually turned out to be.

However, I am satisfied, in addition, that Hinchey, of the Quogue, carelessly miscalculated the passage past the tail of this tow which he hoped to make.

The surrounding circumstances all indicate that his car float was rather close to another tow, proceeding in the same direction, on his port side, while he would soon approach the slight bend in the stream, to his starboard, along which the Hempstead and her tow had, to his knowledge, previously come.

There is testimony that Hinchey so "miscalculated or something else." It seems to me that this conclusion is both reasonable and probable.

Under the circumstances shown, the captain of the Quogue failed to use the reasonable care and ordinary skill which was required of a prudent captain. As the proximate result, the Quogue collided with the tail of the Hempstead tug. Naturally the Quogue blames the tug Hempstead for the collision.

█ The necessity of a tug captain keeping his tow in line is constantly repeated in the cases, The Pencoyd (D. C.) 157 F. 134; The Aurora (C. C. A.) 258 F. 439; The Wrestler (C. C. A.) 232 F. 448; The Madison (C. C. A.) 259 F. 850.

This is a wise and necessary precaution especially in a busy thoroughfare like the

East River. It means that a "tow is held to a degree of care commensurate with the risk, or, as some authorities seem to hold, to a high degree of care, or extreme care to avoid danger of collision." The Maine (D. C.) 2 F. (2d) 605, 607.

While the decisions will usually be found to apply to long hawsers, with tows having naturally a wide swing if carelessly handled, and the absence of a helper tug where due care required the presence of such vessels, yet the length of a hawser has not been the test. The Fred B. Dalzell Jr. (C. C. A.) 1 F.(2d) 259. It is whether due care was used.

■ In this present case the hawser was 15 fathoms, or 90 feet, according to the Hempstead captain, who was the best judge of the length. Hinchey, of the Quogue, made it even shorter. Strout, master of the barge, made it slightly longer.

There was nothing unusual about this hawser which would likely produce a swing. Yet, as I have said, it is not the length of the hawser that would excuse a tug captain from the necessity of keeping his tow in line.

The question therefore is, Is there proof before me that Gaines of the Hempstead allowed the tail of his tow to get out of line? I do not think there is. On the contrary, I think the proof shows that it did not get out of line and that the collision was caused solely by the Quogue's negligence.

Strout, master of the barge and standing on her deck, testified the tow was in line.

Gaines, captain of the Hempstead, as well as the mate of the Hempstead, both swear positively that they observed the tow and that she was in line.

Hinchey, the captain of the Quogue, whose interest is apparent, and Connelly, the boatman on the car float, and Schaff, the second deck hand on the Quogue were witnesses for the Quogue. Connelly and Schaff impressed me as reliable witnesses. A consideration of their testimony, however, does not seriously contradict the testimony of those of the Hempstead.

Connelly testified that the only swing he saw of the tow was "the usual swing." There is nothing in his testimony to even indicate that the captain of the Hempstead executed what would have been, under the circumstances, the most unusual, and in view of the heavy sand scows' improbable sudden swing to the starboard of his tow. This witness

concedes that the Hempstead and her tow had been "coming straight down to pass parallel," but that, when the Hempstead had passed the Quogue, about 100 feet away, the last barge of the tow suddenly swung towards the Quogue.

The testimony of Schaff is: "I couldn't say, for sure, which boat swung. It looked as if the tow swung over." And he also testified: "Q. When the tow was passing, the tow was straight behind the tug? A. Yes."

The testimony of Herrick, while not reliable, adds nothing to the others. In other words, the fair preponderance of proof shows that prior to and at the time of the collision the tow of the Hempstead was in line.

Both Connelly and Schaff had a plain view of the tug Hempstead as she approached and passed. The former was by the galley and the latter sitting on the forward rail, on the starboard side of the tug Quogue. They apparently observed everything; yet there is no testimony from them or anybody else that they observed the captain in the pilot house of the Hempstead turn his wheel or change his course.

Schaff's idea is that it "was either the tide or else he must have starboarded his helm." This speculation is based on his further speculation that the tail of the tow and the Quogue came together because the former swung in.

■ However, while I feel sure that the collision was caused solely by the plain negligence of the captain of the Quogue, as already stated, even if there was a doubt about it, it would not be sufficient. On the contrary, the negligence, if any, of the Hempstead, should have been proven by clear and convincing preponderance of evidence. The Cornell (C. C. A.) 15 F.(2d) 375; The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84, 85.

■ The barge Bofisco was at all times helpless in this matter. It was not responsible for the fault of the tug even if same had been proven. Naamlooze v. Moran (C. C. A.) 9 F.(2d) 614; The No. 34 (D. C.) 13 F.(2d) 927, 928.

Libelant is entitled to a decree against the Quogue, with costs. The petition of the Quogue should be dismissed, with costs. Submit decree with the usual reference.