**MISSISSIPPI VALLEY BARGE LINE COMPANY**

v.

**THE QUEMADO LAKE, Her Engines, Etc.**

**No. 2229.**

United States District Court
E. D. Louisiana, New Orleans Division.

Nov. 9, 1956.

Lemle & Kelleher, Selim B. Lemle, New Orleans, La., for libellant.

Terriberry, Young, Rault & Carroll, Alfred M. Farrell, Jr., New Orleans, La., for respondent, claimant.

CHRISTENBERRY, Chief Judge.

The libel in this action arose out of a collision between the towboat New Orleans and the S. S. Quemado Lake, which the libel alleges was caused solely by the fault of the latter vessel. Respondent answered and cross-libelled, admitting the collision, but alleging that it was caused by the sole fault of the towboat New Orleans.

The case came on for trial on the issue of liability only, and the Court, having considered the pleadings, the evidence adduced, the arguments of counsel, and the law applicable, makes the following findings of fact and conclusions of law:

### Findings of Fact

#### I.

At all times material hereto, Mississippi Valley Barge Line Company was and now is a corporation organized under the laws of the State of Delaware.

#### II.

At all times material hereto, Esso Shipping Company was and now is a corporation organized under the laws of the State of Delaware.

#### III.

At all times material hereto, Mississippi Valley Barge Line Company was the owner and operator of the Towboat New Orleans, a twin screw vessel propelled by two diesel engines of approximately 3,600 indicated horsepower, and the engines are pilot house controlled. The vessel is 213 feet in length over-all, 43 feet wide, and its full depth approximately 10 feet. She has two steering rudders located aft of her propellers, used for steering when going ahead, and two backing rudders located forward of her propellers, used for steering when going astern.

#### IV.

At all times material hereto, Esso Shipping Company was the operator of the Quemado Lake, an American tank steamship, single screw, 526 feet long.

#### V.

On the night of June 20, 1956, the New Orleans was shoving ahead a tow of 17 barges in five tiers. The overall length of this tow was 872 feet, and its width was 105 feet at the widest point. The combined length of the towboat and tow was 1,087 feet. Captain Roy Clay, an old experienced river pilot, was in charge of her navigation.

#### VI.

On the same date, the Quemado Lake was loaded and drawing 30 feet forward and 31 feet 10 inches aft, or a mean draft of 30 feet 11 inches. Captain

Carlton F. Trosclair, licensed as a Master First Class Pilot on the Mississippi River in the area of the collision, was in charge of the Quemado Lake.

## VII.

On the night of June 20, 1956, at about 9:15 P.M. (time shown by the New Orleans' clock), the New Orleans was in collision with the Quemado Lake at approximately mile 172.5 a.h.p. (above the head of the passes). The night was dark but visibility was otherwise unimpaired by weather factors. Both vessels were properly showing all lights. The river was about 1,800 feet wide at the point of collision.

## VIII.

The New Orleans was proceeding upstream from Crescent Light at mile 146.8 a.h.p., at an average rate of speed of 3.8 m.p.h. over the bottom. When the New Orleans and her tow reached Riverton Light at mile 171.2 a.h.p., on the left descending bank of the river, it was favoring that bank. Captain Clay then laid a course toward the right descending bank of the river, which placed Riverton Light 50 yards on his port stern and Rateau Light on the right descending bank at mile 173.0 a.h.p., 50 yards on his port bow, and which if continued to the right descending bank of the river would have brought the head of the New Orleans flotilla to that bank 50 yards upstream from Rateau Light. He intended to turn to his starboard, after passing the center of the River, and steering upstream past Brangier Point, on the left descending bank of the river. While on this course and approximately midway between Riverton Light and Rateau Light, Captain Clay, for the first time, became aware of the presence of the Quemado Lake, when that vessel, downbound and on the left descending bank of the river above Brangier Point, emerged from behind the point so as to be visible to a vessel below the point. At this time the New Orleans and her tow were about 500 feet from the right descending bank.

## IX.

Earlier, the Quemado Lake had departed Baton Rouge, travelling downstream, and passed Plaquemine Light at mile 208.3 a.h.p. From that light until she reached White Castle Light at mile 198.4, the vessel was averaging 15.4 m.p.h. over the bottom, and her wheel was turning at 80 to 82 revolutions per minute at full speed ahead. At 7:17 P.M., on orders from the bridge, the wheel was increased to 90 r.p.m., and from White Castle Light to the point of collision she was averaging 17.23 m.p.h. over the bottom. As the vessel passed the Donaldsonville Ferry crossing, a few miles above Brangier Point, her speed was reduced, but it was increased to full speed ahead again as it approached Brangier Point. From Brangier Point on the left descending bank of the river, a course was laid to Rateau Light on the right descending bank of the river in order to follow the channel for deep draft vessels, which course then proceeded downstream on the bend side of the river. As the beam of the vessel was in the center of the river, approaching Rateau Light, the pilot first noticed the green light on the head of the tow of the New Orleans. A few seconds later the pilot noticed the green light on the towboat.

## X.

The New Orleans blew one long whistle, as did the Quemado Lake almost simultaneously, indicating a port to port passing. The distance between the Quemado Lake and the head of the tow at that time was less than one mile. Immediately the New Orleans was swung to starboard for about 15 seconds in an attempt to allow ample passing room on her port for the Quemado Lake, and was put back on center or perhaps 5 degrees to port so as to steady up the New Orleans flotilla. When the New Orleans turned its tow to starboard the stern of the towboat necessarily "crabbed" to the left in the direction of the right descending bank and the course of the Quemado Lake from Rateau Light.

Meanwhile, the Quemado Lake, moving toward Rateau Light, crossed the head of the New Orleans and her tow 100 yards upriver from it, approached practically into the mud on the right descending bank, which caused her to sheer to the left and toward the center of the river. Furthermore, the vessel was steered to hard left at this time in order to leave the bank. About 30 seconds thereafter, the port side of the Quemado Lake struck the port side of the New Orleans' stern while the vessels were in the bend side of the river.

### XI.

The speed of the New Orleans was never diminished during the above events. The Quemado Lake was run full ahead at all times, except, when the vessel was in the right descending bank, the engines were stopped but almost immediately put full ahead again because the Quemado Lake would not then answer to her helm.

### Conclusions of Law

#### I.

The subject matter of this litigation, a marine collision, is within the admiralty and maritime jurisdiction of the Court. 28 U.S.C. § 1333.

#### II.

Navigation of the waters wherein this collision occurred is governed by the "Pilot Rules for the Western Rivers and the Red River of the North".

#### III.

■ The Quemado Lake was at fault in:

(a) proceeding at too high a rate of speed for a deep draft vessel in restricted waters and endeavoring to pass the New Orleans flotilla without reducing speed;

(b) negligently navigating too close to the right descending bank, which caused the Quemado Lake to smell the bank and to take a sheer to its left or, alternatively, oversteering to the left, by reason of which the Quemado Lake did not make good a course down-river parallel with the right descending bank, but ran out toward the center of the river and struck the New Orleans;

(c) not navigating in a manner so as not to embarrass the Towboat New Orleans, which was encumbered with a large and heavy tow. The Mayumba, D.C.N.Y.1834, 21 F. 476, The Rose Culkin, D.C.N.Y.1892, 52 F. 328, The Lucy, 4 Cir., 1896, 74 F. 572, The Georgetown, 4 Cir., 1905, 135 F. 854; The Westhall, D.C.Va.1899, 153 F. 1010, The Maine, D.C.Or.1924, 2 F.2d 605, Cf. Intagliato v. Ship Owners and Masters Towboat Company, Cal.App.1955, 159 P.2d 1, 1946 A.M.C. 263;

(d) continuing to go full speed ahead in the jaws of collision and not going full astern. The New York, 1888, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126.

#### IV.

■■ There is a custom on the Mississippi River of such long standing as to have the force of law that up-bound vessels proceed up under the point and down-bound vessels proceed down in the bend. The Stephen R. Jones, 5 Cir., 27 F.2d 208; The Norne, 5 Cir., 59 F.2d 145. The New Orleans flotilla violated this rule by crossing the center line of the river onto the bend side, and therefore carries the burden of showing that this violation not only did not but could not have caused the collision. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. This burden the New Orleans has not successfully discharged.

#### V.

■ For the reasons above given, I find that this collision occurred through the mutual fault of the tanker Quemado Lake and the steamer New Orleans, and that the damage resulting therefrom should be divided between them. Interest shall run from the date of the final decree fixing damages.