### THE SAUCON.

### EDWARD G. MURRAY LIGHTERAGE & TRANSPORTATION CO. v. EXPORT S. S. CORPORATION et al.

### No. 10175.

District Court, E. D. New York.
March 31, 1930.

Foley & Martin, of New York City, Macklin, Brown, Lenahan & Speer, of New York City, and William F. Purdy, of New York City, for libelants.

Haight, Smith, Griffin & Deming, of New York City, for claimant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, for respondent-impleaded.

BYERS, District Judge.

On the afternoon of January 15, 1927, the steamship Saucon (400 feet long) left her pier at Java street, Brooklyn, at about 1:06 o'clock, bound to sea; she passed down the East River and, under the Brooklyn Bridge, was in about the center of the stream; she at once veered towards the Manhattan piers, at slow speed, namely, about five knots; the ebb tide added, perhaps, one and one-half knots to the engine's speed.

Approximately opposite Pier 9, the Saucon was about two lengths (800 feet) from and parallel to the Manhattan shore. There had been frequent snow squalls and, about 1:39 p. m., there was driving snow, and the master, who was on the bridge, testifies that visibility was about two shiplengths at that time.

In the position stated, the Saucon sighted the tug Admiral Dewey, headed upstream and having in tow two barges alongside, and the Saucon, believing that the circumstances so required, stopped her engines, went into full speed astern, dropped her starboard anchor, and paid out thirty-five to forty fathoms of cable, in the effort to make the anchor hold; this maneuver retarded the headway of the ship, and the ebb tide swung her stern out into the stream, so that shortly she headed into the slip between Piers 5 and 6, and, her momentum not having been overcome, she entered, causing damage to some twenty-three barges and canal boats there in occupation.

The fact that the damage was done was not contested, and the twenty-three libels which have been filed were consolidated by appropriate proceedings, and proof was taken as to the fact of damage, in this cause.

The Saucon seeks to avoid liability by petition filed against Berwind-White Coal Min-

ing Company, owner of the tug Admiral Dewey, on the theory that the latter was so maneuvered as to cause the Saucon to enter the slip as stated, in order to avoid collision with the tug and her tow.

The Admiral Dewey, on the day in question, was proceeding from a Jersey City pier, with the Eureka Barge 92 on her starboard and the Eureka Barge 76 on her port side, on her way up the East River, destination undisclosed. She rounded the Battery about 200 feet off shore, thus seeking to avoid the force of the ebb tide by navigating in comparatively slack water near the Manhattan shore. There was a northwest wind blowing, and the tug and her tow were making headway of about two miles an hour.

The Admiral Dewey swung a little bit wider of the Battery than would be indicated by a constant position of 200 feet off shore, and she was, therefore, headed slightly towards the Manhattan piers at the time that the Saucon was sighted.

At about 1:39 p. m., the Saucon, being distant not less than 400 feet from the Dewey, and probably somewhat more, and being from 400 to 600 feet further from the Manhattan shore than the Dewey, blew a two-blast signal, indicating a starboard to starboard passing, which was the only practicable maneuver under the circumstances.

The testimony for the Saucon is that the tug answered with a one-blast signal, indicating a crossing of the Saucon's signal, and it is that alleged response of the Dewey which is said to have caused the Saucon to stop her engines, blow an alarm signal, go into reverse, and drop her anchor as above stated, in the belief that otherwise a collision with the tug or her tow was inevitable.

The testimony for the Dewey is that the tug answered with a two-blast whistle, which was the obvious thing to do. If the testimony for the tug is to be believed, she was without fault and the Saucon was guilty of an error of navigation which gave rise to the damage in question. It becomes necessary, therefore, to decide where the truth lies as to that issue.

The testimony for the Saucon would be more convincing than it is, if the versions now given of the tug's handling were corroborated by the reports made by the Sandy Hook pilot to the Board of Commissioners of Pilots, and by the master of the Saucon to the United States Local Inspectors, which reports were made within forty-eight hours after the occurrence. These reports are as follows:

"New York, January 17, 1927.

"Board of Commissioners of Pilots, Whitehall Terminal Building, New York, N. Y.

"Gentlemen: I was pilot on the SS: Saucon, January 15, 1927. When proceeding down East River at half speed, ebb tide, and driving snow. When off Pier #7, sighted Berwin Coal Company tow on port bow, with two (2) loaded barges crossing to starboard. As a collision was apparently inevitable, ordered engines full speed astern at 1:37 p. m., and dropped anchor to check weigh of ship. The SS: Saucon failed to answer her helm. At 1:42 p. m., collided with Lighter 'Marion Murray' and 'Helen F. Murray,' which were moored between Pier's; #5 and #6, East River. A third barge apparently loaded was also damaged. No damage to ship.

"Respectfully submitted,
"[Signed]   Wm. S. Ireland, Pilot."

"WSI/B

"The Export Steamship Corporation, 25 Broadway, New York.

"U. S. Local Inspectors, Steamboat Inspection Service, New York, New York.

"Subj: Collision with Lighters Marion and Helen F. Murray while proceeding down East River to sea.

"Gentlemen: I beg to report that while proceeding down East River under easy steam (ebb tide and driving snow) with Pilot W. S. Ireland in charge, we sighted a Berwin Coal Co. tow on the port bow with two loaded barges crossing to starboard.

"As a collision was apparently inevitable, we promptly reversed our engines to full speed astern (1:37 P. M.) and dropped our anchor to check weigh of ship. The vessel failed to answer her helm or lose her weigh and collided (1:42 P. M.) with Lighters Marion Murray and Helen F. Murray which were moored between Piers 5 and 6 E. R. A third barge, apparently loaded, name not to be seen, was also struck.

"No damage was sustained by this vessel.

"This is the American Steamship Saucon (5106), owned and operated by the American Export Lines of 25 Broadway, New York City.

"I am, gentlemen, Yours very respectfully,

"P. Gibson, Master."

The testimony is that these reports were prepared independently of each other, although certain similarity in phraseology is obvious. It is more important to observe that in neither report is any mention made of the

alleged crossing of signals by the Dewey. If there had been a one-blast signal given in answer to the two-blast signal of the Saucon, it is believed that either the master of the Saucon or the pilot, or both, would have been at pains to so state in making these reports.

Nor was the respondent notified of the claim until over three months after the occurrence (Respondent's Exhibit 4).

The testimony for the Saucon consists in the depositions taken of her master, first mate, chief engineer, first assistant engineer, and second assistant engineer; and the testimony on the trial of the Sandy Hook pilot, John A. Bassett, captain of another tug, Sjolund, mate of another tug, and one Log, pilot of the tug of which Bassett was the captain.

The master of the Saucon was Captain Gibson, who was on the bridge, as has been stated, and he says that he sounded fog signals all the way down the East River. His testimony is contradicted in this respect by both the pilot and the chief officer, who say that no fog signals were sounded; the captain says that he did not hear any two-blast signal from his own vessel, the Saucon, nor did he see or hear any answering signal by the tug, so that his testimony throws no light on this aspect of the controversy. He does say, however, that, in his judgment, a starboard to starboard passing could not have been made, but the contrary is stated by the Sandy Hook pilot, and by the chief officer who was on the bow of the Saucon at the time in question.

There was a dispute on the bridge of the steamship between the master and the Sandy Hook pilot as to what should be done in the emergency which apparently confronted the Saucon. Seemingly an order was given by the master to drop the starboard anchor, which was countermanded at the instance of the pilot, and later repeated.

Thus, at page 78:

"Q. You think in a case like that, where prompt action is necessary, it is better to have two men giving orders than one, do you? A. No.

"Q. That is what was going on on this occasion? A. The Pilot gave an order, I said 'That won't do' and I promptly gave another order and he agreed with it.

"Q. After you had done something and you didn't agree with what he had done he agreed that what you had done was the better thing to do? A. Yes.

"Q. How many times did that happen, as you came down the river? A. I would say

twice, when the collision was inevitable. Prior to that I had no reason whatever to interfere with the way the Pilot was handling the property."

Reference is made to the foregoing in connection with the testimony of the pilot, for the reason that the latter clearly asserts that, when he saw the tug, the Saucon was off Pier 8 or 9 and blew two whistles, and the Dewey answered with one whistle, when the latter was about at Pier 6, whereupon the pilot blew the alarm signal, dropped the starboard anchor, etc.

If there was a difference of opinion on the bridge of the Saucon and if the captain, who was there, is mistaken as to his prior blowing of fog whistles and did not know that his own vessel had blown a two-whistle signal, and did not know whether the tug blew any answering whistle, and if the pilot and the captain were in disagreement as to the immediate step to be taken, it is reasonable to infer that what actually took place would not leave a very clear impression in the mind of either, for which reason the testimony of the pilot as to the answering signal of the tug is not persuasive.

The chief officer, J. C. Henderson, as has been stated, was on the forecastlehead, right in the eyes of the ship, with the boatswain who was standing about ten feet aft of the former, by the starboard bits; it was the latter who first sighted the tow and reported it to the bridge, and then the chief officer observed the tow, which was headed somewhat across the bow of the Saucon; the chief officer could see only the starboard bow of the tow, and heard the Saucon sound the two-blast whistle, and says that the tug answered with one whistle; that the latter was followed by the alarm signal sounded by the steamship, and the engines were put astern.

Lying at the end of Pier 5 were the tugs Narkeeta and Anna W.

John A. Bassett, the captain of the former, was at Pier 5, and saw the steamer and the tow approaching each other under the circumstances described. He testified clearly: He heard the two long blasts from the Saucon and an answering one-whistle signal from the Dewey, this being followed by the danger signal heretofore described. He says that his tug let go and got out of the way, fearing contact with the on-coming steamship. He says that he first saw the steamship off Pier 8, and that the tug was nearer the Manhattan shore than the Saucon; he saw the steamer let go her starboard anchor, and he thinks that about six minutes elapsed be-

tween the two-blast whistle from the Saucon and the entry of the latter into the slip. His tug was heading up the river and the Dewey was about 300 or 400 feet away from him as she rounded the Battery. His testimony is corroborated by that of George Sjolund, who was the mate of the tug Anna W., lying outside of the Narkeeta; he did not observe the name of the tug (Dewey), and made no report of what he saw. Gray Harris was the master of the tug Anna W at the time, but was not called.

Sjolund says that the Saucon was off Pier 9 or 10 when he heard her blow a two-blast signal, and she was about 800 feet away from his position.

The last witness on this subject was Harold Log, who was pilot on the Narkeeta, and whose testimony agrees with that of Captain Bassett.

The last three witnesses referred to are disinterested, and their testimony gives much weight to the contention advanced by the claimant on the subject of the exchange of signals.

For the respondent, Captain Leach, of the tug Dewey, testified that, as he rounded the Battery, he was 200 feet off shore, headed straight up the river, and saw the Saucon off Pier 10. She was heading a little towards New York, and blew two whistles which the tug answered with two. He then saw the Saucon veer towards the shore; heard the alarm whistle, and saw the starboard anchor dropped from the steamer. He put his tug full speed astern, and avoided contact with the Saucon, because the tug moved only a few feet after the engine stopped, by reason of the retarding force of the tide. The tug went on up the river, around the stern of the Saucon, as the latter was entering the slip, passing about 25 feet from the stern. He says that, when the vessels sighted each other, they were separated by nearly two lengths of the Saucon, which would be about 800 feet.

John Drain, the mate on the Dewey, who was in the pilot-house, testified substantially in all respects as his captain.

The engineer testified as to coming around the Battery about 200 feet from the pier heads, but, having been in the engine room, he did not know what whistle signals were blown.

Olsen, the steward on the Dewey, stepped out on the starboard deck as the boat rounded the Battery, and was walking forward and saw the Saucon as previously described, and heard the two-whistle signals exchanged.

In many respects, the strongest testimony offered for the claimant is that by Ferdinand Lederle, who was the third officer on the Saucon at the time in question and who left the employ of the owner of the steamer two years ago, and had previously made no statement.

He had been relieved and was leaving the bridge as the Saucon approached the Dewey and did not go below because he was interested to see what would take place. He says the tow was a shade on the starboard bow of the Saucon, and that the latter was about at Pier 9 and distant therefrom 700 to 750 feet. The tow, he says, was about a ship's length off the piers. The Saucon blew two whistles, and the tug answered with two. He says he is positive of this, and that this exchange of starboard to starboard signals was in accordance with the passing maneuver that was obviously indicated. He describes the make-up of the tow according to the other evidence in the case.

Lederle is clearly a disinterested witness, and his testimony is to be weighed in opposition to that of the men from the tugs at Pier 5, who were engaged in their own affairs primarily, at the time in question.

Having in mind that neither the master of the Saucon nor the Sandy Hook pilot reported the alleged crossing signal of the Dewey within forty-eight hours after the occurrence, and that all competent witnesses, except Captain Gibson, who were asked the question, said that a starboard to starboard passing was the only practicable maneuver, the conflict of testimony above referred to must be resolved in favor of the respondent tug, on the theory of probabilities.

The tow was the less mobile of the two elements and was bucking the tide, and was more or less unwieldy; it would have been a difficult thing for her to alter her course so as to pass the Saucon port to port, which was 500 feet nearer the center of the river, and it would only be as the result of confusion that such a decision could be attributed to the captain of the tug.

There has been no element of hesitancy or change of purpose disclosed on the part of the navigator of the tug, while the contrary is clearly shown by the testimony of the master of the Saucon as to what took place on the bridge, as has been seen; the starboard to starboard passing was not only appropriate, it was required by the circumstances, and could have been carried out but for the moment of indecision on the bridge of the Saucon, which is clearly revealed by the statement of the master, that he did not believe

956

that the starboard to starboard passing could be accomplished. It was that error of decision which caused the Saucon to abandon the movement which was initiated by her two-blast signal.

If it be assumed, for the sake of argument, that the tug did cross the signals by answering with one blast, intelligent navigation would have required the Saucon to adhere to her announced determination of making a starboard to starboard passing, because of the obvious inability of the tow to alter her course so as to accomplish a port to port passing, as the vessels then were heading.

It should be noted that neither the second officer, who was on the bridge with the captain of the Saucon, nor the wheelsman, nor the boatswain, who was on the forecastle with the first officer, has been produced as a witness, nor has the absence of any of them been accounted for.

■■ There remains to examine the contention which has been pressed upon the court, that the East River Statute (Laws N. Y. 1882, c. 410, § 757) was violated by the Dewey in that she was proceeding up the East River near the Manhattan shore, instead of being as near the center as possible. It will be recalled that neither vessel was entering or leaving a pier, nor were any other intervening craft. This contention would be of weight if it were the proximate cause of the entry of the Saucon into the slip between Piers 5 and 6, but that is not the fact. If the Saucon had been properly navigated, she would never have entered the slip; she would have passed starboard to starboard of the Dewey and her tow.

Authorities which overlook the departure from the East River Rule, when it is not the proximate cause of the misadventure, are the following: The Wrestler (C. C. A.) 232 F. 448; The Clara (C. C. A.) 55 F. 1021.

The Black Diamond (C. C. A.) 273 F. 811, has been carefully considered in this connection; it is believed that the circumstances there disclosed are quite opposed to the facts in this record; it was the interposition, in that case, of a vessel emerging from a pier, which led to the collision then involved. As has been stated, there was no agency intervening to influence the handling of either the Saucon or the Admiral Dewey in the record under examination.

In the belief that the Saucon was solely at fault, the petition will be dismissed, with costs, and the usual interlocutory decree may be taken against the Saucon on behalf of all libelants, with costs.