## THE BERN.

### In re READING CO.

District Court, S. D. New York.
Nov. 20, 1933.

742

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston and Carl F. Vander Clute, both of New York City, of counsel), for Reading Co. and Tice Towing Line, Inc.

Bigham, Englar Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for Philadelphia & Reading Coal & Iron Co., Weston Dodson & Co., Inc., Cambria & Lackawanna Coal Co., and Madeira Hill & Co.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for O'Boyle and Murray Transp. Co.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and Chas. S. Haight, Jr., both of New York City, of counsel), for Export S. S. Corporation.

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for Sargent Barge Line, Bouchard Transp. Co., Inc., Western Assur. Co., New York Steam Corporation, and Michelson Coal Corporation.

Theodore H. Ward, of New York City, for William Costello.

COXE, District Judge.

These suits grow out of a collision in the East River, near Grand street, on January 15, 1930, at about 7:46 p. m., between the steamship Exbrook and the tow of the tug Bern, consisting of twelve loaded coal barges. The Exbrook was proceeding down stream and the Bern tow up stream at the time of the collision; and the Perth Amboy No. 1 was acting as a helper tug to the Bern. The tide was strong flood, running about 3½ knots an hour, and the weather clear. Six of the twelve barges in the tow were sunk; and the owners of the barges, as well as the owners of the respective cargoes on the barges, have filed libels and claims. Limitation proceedings have also been instituted on behalf of the Bern and the Perth Amboy No. 1, and in these proceedings the right to limit has been conceded in the event liability is found. At the trial, the different suits were consolidated, and all have been heard together as one case.

On the night of the collision, the Bern was proceeding up the East River, bound for Newtown Creek, with a hawser tow of twelve loaded coal barges. The tow was made up in five tiers, with three boats in each of the first three tiers, two boats in the fourth tier tailing behind the middle and starboard boats of the third tier, and one boat in the fifth tier tailing behind the starboard boat of the fourth tier. There were two short wire hawsers of about 30 fathoms to the head tier, and the Perth Amboy No. 1, the helper tug, was stationed alongside the starboard boat in the second tier. The Bern had three staff lights, indicating a length of tow exceeding 600 feet, and all other lights were properly displayed.

Opposite Corlears Hook, and about 570 feet from the Brooklyn shore, lay the sunken wreck of the Glendower, which was buoyed, as shown on the government chart (Exhibit 1); and, with the tide strong flood, the Bern tow necessarily had to pass on the Manhattan side of the Glendower on the way up the river.

When the Bern was off the south end of Corlears Hook, the Exbrook was sighted passing under the Williamsburgh bridge, and about in the middle of the river, slightly favoring the Manhattan shore. The Exbrook was then showing her green light; and the Bern sounded a one-blast signal for a port to port passing. This was answered by the Exbrook with a one blast; and then, after an interval of 15 or 20 seconds, during which, according to Captain Grimes of the Bern, the Exbrook continued to show her green light, the Bern blew a second one-blast signal, which was again answered by the Exbrook with one whistle. "A couple of seconds" later, the Bern blew the alarm, and the collision followed "in less than a minute" thereafter.

It is insisted on behalf of the Bern that the Bern was in the middle of the river with her tow tailing straight behind, and that the Exbrook, after accepting a port to port passing, failed to change her course to starboard, and came head on for the tow, striking the port barge of the front tier squarely on the bow. It is also urged that the Exbrook did not act promptly after the probability of collision became apparent. For the Exbrook, it is contended that the Bern tow was out of position, and not in the center of the river, and that the barges were swept broadside across the Exbrook's bow at a time when the

forward movement of the Exbrook was completely arrested.

All of the witnesses agree that the collision took place off Grand street, below the Williamsburgh bridge; but the testimony is conflicting as to the distance from the Manhattan shore that the vessels came together, the witnesses for the Exbrook placing the point of first contact between 300 and 500 feet offshore, and the Bern's witnesses insisting that the tow was "in the middle of the river," or, as stated by Captain Grimes of the Bern, "between 600 and 700 ft." out from the Manhattan pier ends. The blueprint of the United States Engineers Department, First District (Exbrook Exhibit K) indicates, however, that two of the barges went down well on the Manhattan side of the river, which could hardly have taken place if the tow had been in the center of the river, as insisted by the witnesses for the Bern.

There is also a serious conflict as to the way the vessels contacted, Captain Grimes testifying that the Exbrook struck the port barge in the head tier "across the bow a little on the port side" and "not on the side"; whereas the witnesses for the Exbrook all insisted that the steamship struck either broadside or at an angle on the port side of the outside barge in the first, second, or third tiers. But by far the best witness of the collision was Lacey, the lookout on the Exbrook, who was looking down from the stem of the Exbrook when the collision occurred; and he testified that the contact was with the port barge in the first tier "about 10 feet aft of the bow." Fitzgerald, mate of the Revere tug, which was pushing on the port bow of the Exbrook, was also positive that the contact was with the port side of the tow, although he thought it was the port barge in the second tier, and not the first tier, which was struck. These two witnesses impressed me favorably, and I think their version of the collision is substantially correct. On no other hypothesis is it possible to explain Captain Grimes' testimony that he saw only the green light of the Exbrook until just before the collision. And if the Exbrook had struck the tow head-on, as shown in Captain Grimes' diagram (Exhibit A), there surely would have been more damage to the Exbrook than merely "a little paint knocked off of her stem," as testified to by Captain Chambers.

I think it is clear, too, that the Bern tow was out of position after rounding Corlears Hook. Captain Grimes of the Bern testified that he was "about 600 to 700 ft. off of the Manhattan shore" when he first saw the Ex-

brook, and that he left the Glendower wreck "between 200 and 300 ft." on his starboard side; yet two witnesses from the tug Socony No. 8, who were called by the Bern, testified that the Socony No. 8, bound down stream with a scow on each side, passed the Bern opposite the Glendower wreck, starboard to starboard, and that, at the time, the Socony No. 8 "was about 200 ft." from the Glendower buoy, and the Bern "about 100 ft." further off, towards the Manhattan shore. Manifestly, if the Bern tow had been in the middle of the river, the vessels would have passed port to port, and not starboard to starboard, as they admittedly did. Moreover, Captain Grimes' story is further contradicted by Captain King of the tug William A. Jameson, who testified that, as he was coming out of the Jay Street Terminal, Brooklyn, bound up the river, he saw the Bern off Pier 36, Manhattan, and "she was parallel with the New York shore," not "more than 400 or 500 ft. off." I can see no escape, therefore, from the conclusion that the Bern was well on the Manhattan side of the river before rounding Corlears Hook.

But it is argued that, as the set of the tide below Corlears Hook was on the Brooklyn shore, the tail of the tow would inevitably have been carried out into the center of the stream when the Bern rounded the hook. The flood tide unquestionably has a strong set towards Brooklyn below Corlears Hook, but, if the tow was out of position before reaching that point, the spread of the water above Wallabout might well have caught the tow on the starboard side, and prevented it from straightening out in the river. This same argument, with respect to the effect of the flood tide in the neighborhood of Corlears Hook, now pressed on behalf of the Bern, was rejected by Judge Hough in The Montauk (C. C. A.) 9 F.(2d) 882, at page 883, as follows: "Undoubtedly at Corlears Hook the flood tide sets toward Long Island. One need only look at the chart to see why, viz.: The flood tide is caromed off from the downstream side of the Hook and toward Brooklyn, just as a billiard ball bounces from its cushion. But that does not mean that the flood tide is setting toward Brooklyn above the Hook, nor indeed is the tide set pronounced even in midstream."

The Bern was fully hooked up during the entire period just prior to the collision, and her speed, with an underfoot tide of 3½ knots, must have been at least 5 or 6 knots. Captain Grimes testified that, when the first one-blast signal was sounded by the Bern, he put his helm to port, and then, when he blew

the second one-blast signal, he moved his helm further to port "a couple of more spokes." The natural effect of such a movement was to open the starboard side of the tow to the full force of the flood tide, and I think this partly explains how the tow got out of line; for I am convinced that it was tailing toward the Manhattan shore at the time of the collision.

■ The Bern is, therefore, held at fault (1) for failing to have her tow under control, The Wrestler (C. C. A.) 232 F. 448; The Fred B. Dalzell, Jr. (C. C. A.) 1 F.(2d) 259; The Overbrook (C. C. A.) 47 F.(2d) 593; and (2) for violating the East River Statute (Laws N. Y. 1882, c. 410, § 757). The New York Central No. 17 (C. C. A.) 256 F. 220; The Wrestler, supra. I do not think, either, that such cases as The No. 1 (C. C. A.) 180 F. 969, and The Saucon (D. C.) 41 F.(2d) 952, have any application, as the violation of the statute was clearly a contributing cause of the collision.

■ The Perth Amboy No. 1 was merely a helper tug, and had nothing to do with the navigation of the tow. She was hanging on to the outside starboard boat in the second tier, with her engines at rest, until after the Bern blew alarm whistles, and then she dropped back to the third tier to make fast a stern line and haul the tow towards Brooklyn. She was entirely under the direction of the Bern, and is not to be held responsible for the Bern's negligence. Schuyler's Steam Towboat Line v. Caleb, 103 U. S. 710, 26 L. Ed. 467.

It only remains to consider whether the Exbrook was also at fault. She was a single screw vessel, 400 feet long, about 53 feet beam, and drawing, on the night of the collision, 21 feet. Her speed down the river was about 3 knots; and, according to her own engine logs, she was under a slow bell from 7:42 p. m. to 7:43 p. m., and at 7:43 p. m. her speed was increased to half speed, and continued at that rate until 7:45 p. m., when her engines were stopped. When passing under the Williamsburgh bridge, she was in the middle of the river, favoring the Manhattan shore, and, at that point, was "under a slight port helm towards the New York shore" and "heading towards Corlears Hook." When she answered the Bern's first one-whistle signal, her helm was put slightly "more to port." Then after an interval of 15 or 20 seconds, the Bern blew a second time, and this was again answered with one blast. Thereupon the Exbrook's engines were stopped, and instructions were given to have the tug Revere,

stationed at the Exbrook's bow, push the bow of the steamship towards the slack water near the New York shore. The Revere commenced at once to push, and was so engaged for "about half a minute" before the collision, moving the Exbrook's bow during that interval "about two points" toward Manhattan.

In the meantime, alarm whistles had been blown by the Bern, and thereupon the Exbrook reversed her engines, and also blew alarms. The Exbrook's bell book (Exhibit L) shows that the engines were stationary from 7:45 p. m. to 7:46 p. m., and at 7:46 p. m. were placed at "half astern," "full astern," "hard astern." These engine room orders were given almost simultaneously, and the collision occurred "in less than a minute" thereafter. The forward movement of the vessel had, however, been completely checked before there was any contact, and I doubt whether at the time of the collision the Exbrook was moving ahead at all. That was the testimony of the Exbrook's witnesses; and I think Hauffman's estimate of 75 feet, as the distance within which the Exbrook could be stopped after her engines were reversed, is fairly accurate. I am of the opinion, therefore, that, at the time of the collision, the Exbrook had little, if any, forward movement, and was from 350 to 400 feet off Grand street, with her bow headed a little in towards the Manhattan shore.

■ But it is insisted that the Exbrook failed promptly to reverse her engines after the probability of collision became apparent (The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126); and the testimony of Hauffman, the pilot of the Exbrook, before the local inspectors, is relied on principally to support the contention. This testimony was taken soon after the collision, and is in part as follows: "He blew me one whistle and I answered his one whistle, and after be blowed it, I saw quite a mess of barges he had. I did not see how in the world he could clear me. He blew another port whistle and I immediately answered, which would be, I should say—might have been 15 or 20 seconds afterwards."

The plain meaning of this language is that Hauffman, who was in charge of, and directing, the navigation of the Exbrook down the river, had grave doubts when he accepted the port to port passing signal of the Bern as to whether it could ever be safely executed. It is true that Hauffman was forbidden to cross the Bern's one-whistle signal (The Fulton (C. C. A.) 54 F.(2d) 467); but, as stated by Judge

Swan in The Quogue (C. C. A.) 47 F.(2d) 873, "safety is better than pride." Hauffman knew that the Bern tow exceeded 600 feet in length, and, if he had the doubts his testimony before the local inspectors indicates, he should have held back, and not speculated on his ability to get by safely. Yet he did not stop his engines until the second exchange of one-whistles, and there was then an interval of a full minute before his engines were reversed at 7:46 p. m. Whether this minute of inaction is of itself sufficient to charge the Exbrook with fault, it is not necessary to decide (see The Benalla (D. C.) 45 F.(2d) 864); for here the pilot knew when he was at the Williamsburgh bridge that it was extremely doubtful whether the Bern tow "could clear," and he should have acted accordingly, rather than to have assumed blindly that the navigator of the Bern "knew what he was doing," when he proposed a port to port passing.

I think, therefore, that the Exbrook must be held at fault for not stopping sooner than she did; and I do not read Judge Chase's opinion in The Elizabeth Jordan (C. C. A.) 63 F.(2d) 781, 783, as holding anything to the contrary, for in that case there was nothing to show that there was any doubt in the mind of the navigator of the Burlington as to the "apparent ability of the Gramercy to make a safe port to port passing," which certainly cannot be said of the pilot of the Exbrook in the case at bar.

I accordingly hold that the tug Bern and the steamship Exbrook were equally at fault for the collision; and there may be decrees in all suits against both vessels, and dismissing the proceedings against the tug Perth Amboy No. 1; with costs to the successful parties.